Dave A. ALEXANDER and Maclin P.
Davis, Jr., Plaintiffs/Appellees,

v.

Julia Ann White INMAN,
Defendant/Appellant.

Court of Appeals of Tennessee,
Middle Section.

Feb. 8, 1995.

Application for Permission to Appeal
Denied by Supreme Court
July 3, 1995.

Harlan Dodson, III, Anne C. Martin, Dodson, Parker & Behm, Nashville, for appellant.

Ward DeWitt, Jr., Trabue, Sturdivant & DeWitt, Nashville, for appellees.

## OPINION

KOCH, Judge.

This appeal involves a dispute over a $501,000 attorneys' fee in a divorce case. Two attorneys filed suit against their former client in the Chancery Court for Davidson County after she refused to pay their final bill. A jury awarded the attorneys $263,985 in addition to the $159,000 they had already received. On this appeal, the client takes issue with the trial court's evidentiary rulings, the adequacy of the jury instructions, the sufficiency of the evidence, and the trial court's refusal to grant an additur or to make an independent determination of the reasonableness of the fee. We have determined

that the judgment must be reversed because the trial court improperly excluded competent evidence concerning the reasonableness of the fee and because the jury instructions were incomplete.

## I.

Julia Ann White Inman and Gordon Everett Inman were married in 1960. The first of their four children was born in 1963, and Ms. Inman remained at home for the next twelve years working as a wife and mother. After their children reached school age, both Mr. Inman and Ms. Inman obtained their real estate licenses and went to work for a realtor in Williamson County. Mr. Inman also continued to operate a service station in Nashville. The Inmans opened their own real estate business in 1979 in Franklin, and one year later, Mr. Inman invested in a Nutri–System franchise in Nashville.

The parties' hard work and successful investments yielded handsome returns. They moved into a large home in Williamson County known as "Magnolia Hall." Inman Realty became the largest real estate firm in Williamson County. Mr. Inman's partnership became Nutri–System's largest franchisee, and Mr. Inman became chairman of a local bank and acquired a mortgage company. By the mid–1980's, the Inmans were millionaires several times over and were among Williamson County's most prominent and influential couples.

The Inmans' marital fortunes declined as their financial fortunes rose. They separated in April 1987. Ms. Inman retained a Nashville law firm on a straight hourly basis and filed suit for divorce in September 1987 in the Chancery Court for Williamson County. Mr. Inman counterclaimed for divorce shortly thereafter. Trial preparations began in early 1988 after an attempted reconciliation failed. Ms. Inman became dissatisfied with her representation because junior attorneys were doing most of the work on her case and because she believed that they had not effectively prevented Mr. Inman from concealing martial assets. She eventually decided to obtain new counsel after her attorneys set the case for trial without consulting her.

She had already paid $10,000 in attorneys' fees by that time.

Ms. Inman retained David A. Alexander on September 6, 1988. Mr. Alexander requested a $10,000 retainer but did not discuss any other specific billing arrangements with Ms. Inman. He also recommended associating Maclin P. Davis, Jr. to assist with the case. When Ms. Inman expressed concern about using multiple attorneys, Mr. Alexander explained that Mr. Davis was a highly regarded domestic relations attorney and that his firm could "staff up" the case. He also reassured her that "the case would be handled as one lawyer even though we were bringing Mr. Davis into the case."

Mr. Alexander informed Ms. Inman during their first meeting that he possessed evidence, obtained for another divorce client, that would help her case. He permitted Ms. Inman to read a private investigator's report concerning a liaison at a Dallas hotel between the other client's wife and Mr. Inman. Ms. Inman had not been aware of Mr. Inman's infidelity and immediately instructed Mr. Alexander to amend her complaint to add adultery as a ground for divorce.

Mr. Alexander discussed Ms. Inman's case with Mr. Davis by telephone after meeting with Ms. Inman. Several days later, he told Mr. Davis about Ms. Inman's difficulties with her original attorneys and explained that the trial was scheduled to begin in less than one month. Messrs. Alexander and Davis agreed to request a continuance and seek permission to reopen discovery. They also agreed to divide the fee equally, and Mr. Alexander asked Mr. Davis to provide him with a copy of the contract he used when representing wives on other than an hourly basis.

Ms. Inman met with Messrs. Alexander and Davis on September 12, 1988. They did not discuss attorneys' fees until September 22, 1988 when Mr. Alexander handed Ms. Inman a one-page contract and told her, "[t]his is an agreement we need for you to sign." Neither Mr. Alexander nor Mr. Davis explained the agreement to Ms. Inman. Mr. Davis thought that Mr. Alexander had already discussed the agreement with Ms. Inman. Ms. Inman simply "looked down through the paper," signed it, and then re-

turned it to Mr. Alexander. She testified that she did not receive a copy of the agreement until after this dispute arose.

The agreement's provisions relating to the fee and the billing arrangements are unclear. While the minimum fee is based on the retainer or on straight hourly billing, the maximum fee is contingent on the amount of alimony and marital property Ms. Inman received.[1] The provision for billing required the attorneys to bill Ms. Inman within a reasonable time after the charges for the work exceeded $10,000.[2] Ms. Inman understood that the agreement required Messrs. Alexander and Davis to begin billing her when the $10,000 retainer was used up.

The trial court agreed to continue the trial until November 15, 1988 but declined to reopen discovery. Accordingly, Ms. Inman's attorneys had approximately eight weeks to prepare for trial. They filed an amended complaint alleging adultery. They also obtained Ms. Inman's files from her former attorneys, subpoenaed bank records, and requested the trial court to order Mr. Inman to answer interrogatories that had not been answered. Since most of the work centered on identifying and valuing the martial estate, they decided to use the expert witness that had already been retained by Ms. Inman's former attorneys.

Mr. Alexander left most of the actual trial work to his partner, Ernest W. Williams, and Mr. Davis. During the next eight weeks, Messrs. Davis and Williams spent most of their time working on Ms. Inman's case. Mr. Williams met frequently with Ms. Inman. Ms. Inman was a demanding client, but Mr. Davis also found her to be very helpful because she provided documents and other information that enabled them to locate marital property that had gone unidentified during earlier discovery. Ms. Inman repeatedly told her attorneys that she expected to receive the divorce and one-half of the marital property and that she expected Mr. Inman to pay her attorneys' fees. Mr. Davis informed her that he was unaware of any case in which a wife had received one-half of a marital estate the size of the Inmans' and that obtaining 40–45% of the marital property would be a very good result.

The case went to trial on November 15–17, 1988, after Mr. Inman rejected two settlement offers.[3] Mr. Inman took the position at trial that the value of the marital estate was approximately $7.2 million and that Ms. Inman was entitled to real and personal property, including Magnolia Hall, worth $2,275,-200. For her part, Ms. Inman insisted that she was entitled to real and personal property worth $4,555,741. She also insisted that Mr. Inman pay her $400,000 for her attorneys' fees and $8,000 per month in long-term spousal support.

The trial court filed its memorandum opinion in December 1988. It awarded the divorce to Mr. Inman, valued the marital estate at $8,000,000, and awarded Ms. Inman

---

1. Paragraph 3 of the agreement stated:

 The amount of the final fee to be paid by Client for legal services of Attorneys and lawyers and clerks under their supervision shall be a reasonable amount taking *into consideration* the time and labor required, the novelty and difficulty of the questions involved, the skill required to perform the services properly, the amount involved and results obtained, and other relevant factors. Said final fee shall not exceed 15% of the total sum (in money and property) awarded to Client after commencement of the trial of said action for divorce for alimony *in solido*, for five years of alimony *in futuro*, and distribution and division of property, or 10% of such total sum awarded to Client by settlement prior to the commencement of such trial, provided that said fee shall in no event be less than (a) $10,000; or (b) the total amount on a time basis for work of Attorneys and other attorneys and clerks under their

supervision at their usual hourly charges for work.

2. Paragraph 4 of the agreement provided:

 Said retainer feel [sic] shall be credited toward the total charges to Client. If the charges for work exceed $10,000, Attorneys shall bill Client for said excess charges within a reasonable time. Client shall pay said charges at the time they are billed to her.

3. The first settlement offer dated November 3, 1988 provided that Mr. Inman would pay $250,-000 towards Ms. Inman's attorneys' fees and legal expenses. The amount of attorneys' fees had increased to $350,000 by the time of the second settlement offer dated November 14, 1988. Ms. Inman approved these offers with little regard for the amount of requested attorneys' fees because she understood that Mr. Inman would be required to pay them.

$2,300,200 in marital property—only $25,000 more than Mr. Inman's offer.[4] The trial court declined to award Ms. Inman long-term spousal support and determined not to make an additional award for her attorneys' fees in light of the value of the marital property she received. The trial court entered its final judgment on December 29, 1988.

Ms. Inman was extremely upset with the trial court's decision and instructed her attorneys to appeal. Mr. Inman paid over approximately $301,000 as part of the division of the marital property in January 1989. Messrs. Alexander and Davis decided to collect part of their fee, and so on January 19, 1989, Mr. Williams informed Ms. Inman that Messrs. Alexander and Davis "wanted her to pay $150,000 towards attorneys' fees" and approximately $16,000 in expenses and that these funds were "needed for the ongoing case." Ms. Inman agreed because she "just assumed that he [Mr. Williams] needed this as an ongoing retainer fee for the case." She did not ask for an accounting of her attorneys' services and expenses at that time.

Messrs. Alexander, Davis, and Williams shared the responsibility for preparing the brief filed with the Court of Appeals. The court heard Ms. Inman's appeal in July 1989 and filed an opinion on October 18, 1989 that substantially modified the trial court's decision.[5] We dismissed Mr. Inman's counterclaim for divorce because he had perjured himself concerning his extra-marital affair and awarded the divorce to Ms. Inman. In addition, we valued the marital estate at $8,850,000 and awarded Ms. Inman additional marital property worth $1,043,230. We also directed Mr. Inman to pay $5,000 per month in rehabilitative alimony for three years as well as fifty percent of Ms. Inman's attorneys' fees through the trial and seventy-five percent of her attorneys' fees on appeal.

The Tennessee Supreme Court granted Mr. Inman's application for permission to appeal. Mr. Davis argued the case in June 1990 and was accompanied by two other attorneys from his firm and by Mr. Alexander and Mr. Williams. The Supreme Court handed down its decision in April 1991.[6] The Supreme Court affirmed this court's decision to award Ms. Inman $1,043,230 in additional property but gave Mr. Inman the option of paying Ms. Inman the cash equivalent of the parties' equity in the real property awarded to her instead of conveying the property itself. The Supreme Court also vacated this court's decision to award Ms. Inman temporary spousal support and attorneys' fees. The Supreme Court later denied Ms. Inman's petition for rehearing and remanded the case to the trial court for further proceedings.

Ms. Inman was displeased with the Supreme Court's decision. While she had gained the divorce and an additional $1,043,230 in marital property, she had received less than forty percent of the marital estate and had not received spousal support or funds for her legal expenses. At her attorneys' urging, she authorized them to request the trial court to award interest on the marital property she had been awarded.

Notwithstanding the language of the agreement, Mr. Davis did not consider that he had ever represented Ms. Inman on a time basis. On July 10, 1991, he notified Ms. Inman that the total amount of her attorneys' fees was $501,514.50. Mr. Davis' letter stated:

> The total recovery by you in this case is $3,343,430. 15% of that amount is $501,514.50. That is the total amount of the attorneys' fees for Alexander & Williams and me for handling this case from the trial court through the appeal in the Supreme Court. You have previously paid $159,000 of that total fee, which was divided $79,500 to Alexander & Williams and $79,500 to me. The balance of the total fee is $342,514.50. Half of that amount for Alexander & Williams is $171,257.25. The other half to go to me is $171,257.25 plus disbursements of expenses which we have paid in your behalf of $2,021.20. Thus the

4. The trial court awarded Ms. Inman $300,000 in cash, while Mr. Inman had proposed awarding her a 1984 Mercedes worth $25,000 and $250,000 in cash.

5. *Inman v. Inman*, App. No. 89–82–II, 14 T.A.M. 47–5, 4 T.F.L.L. 2–20, 1989 WL 122984 (Tenn.Ct. App. Oct. 18, 1989).

6. *Inman v. Inman*, 811 S.W.2d 870 (Tenn.1991).

total amount to be paid to me is $173,278.45. According to Ernie Williams, you owe an additional amount to Neal & Harwell which you should pay at this time.

Please send Alexander & Williams your check for $171,257.25 and send me your check for $173,278.45. If you have any questions about this, please call me.

Ms. Inman was "very upset" when she received the letter. Shortly thereafter, Mr. Williams reminded Ms. Inman that "Oh, by the way . . . you owe us an outstanding bill."

Mr. Davis also reminded Ms. Inman about the bill during a meeting in mid-August. Ms. Inman responded, "Well, Mac, you know, all of my things have not been collected for me and this thing is not finished. You know, I don't want to discuss this now." Ms. Inman asked for and received a copy of the September 22, 1988 agreement after Mr. Davis replied, "Under the contract I have sent you the bill."

The trial court denied Ms. Inman's request for post-award interest on the value of her marital property. On August 16, 1991, Mr. Davis sent a letter to Ms. Inman informing her of the trial court's action and again requesting payment. The subject of attorneys' fees came up again on August 28, 1991 when Messrs. Davis and Alexander invited Ms. Inman to lunch. After Ms. Inman declined to pay the requested fees, Mr. Davis informed her that her attorneys would no longer represent her. Ms. Inman replied that she intended to ask another attorney to examine the bill and that "[i]f this is the way you feel about me, then I don't want you representing me any longer."

Mr. Davis again requested payment on August 29, 1991. When Ms. Inman did not respond, Mr. Davis notified her on September 20, 1991 that her attorneys were withdrawing from the case. On September 25, 1991, Mr. Davis informed Ms. Inman that he was "preparing the complaint seeking to recover our fees and expenses from you." He added that "Mr. Inman and his friends will probably get considerable satisfaction out of learning that your lawyers have had to sue you and we certain [sic] regret that."

Messrs. Davis and Alexander filed suit in the Chancery Court for Davidson County on December 13, 1991. Ms. Inman denied owing them an additional fee and counterclaimed to recover a portion of the fee she had already paid. She also requested a jury trial. On March 3, 1993, following a three-day trial, the jury returned a verdict for Messrs. Davis and Alexander in the amount of $263,985. Ms. Inman filed post-trial motions requesting a new trial, seeking a remittitur, and requesting the trial court to make an independent determination of the reasonableness of the attorneys' fee award. The trial court denied the motions and entered its final judgment on May 25, 1993. This appeal followed.

## II.

### THE ATTORNEY-CLIENT RELATIONSHIP

■ Attorneys have a fiduciary relationship with their clients and, therefore, must deal with them with the utmost good faith. *Crawford v. Logan*, 656 S.W.2d 360, 364 (Tenn.1983); *Cooper & Keys v. Bell*, 127 Tenn. 142, 150, 153 S.W. 844, 846 (1913); *Planters' Bank v. Hornberger*, 44 Tenn. (4 Cold.) 531, 566–67 (1867); Tenn.S.Ct.R. 8, EC 4–1. The fiduciary relationship arises when a client first consults an attorney and extends to all dealings between the attorney and the client, including the process by which the attorney and the client reach an agreement concerning the terms of employment. *Cummings v. Patterson*, 59 Tenn.App. 536, 541, 442 S.W.2d 640, 643 (1968); ABA Comm. on Ethics and Professional Responsibility, Informal Op. 86–1521 (1986).

■ Attorneys must not permit their own private interests to conflict with those of their clients. Tenn.S.Ct.R. 8, EC 5–1. The amount of good faith which an attorney must exercise in transactions with a client is, therefore, much higher than that required in other business transactions where the parties are dealing at arm's length. *See Newman v. Davenport*, 68 Tenn. 538, 544–45 (1877); *McMahan v. Smith*, 53 Tenn. (6 Heisk.) 167, 170 (1871). Thus, in order to enforce a contract with a client, an attorney must demonstrate:

(1) that he or she provided the client with the same information and advice that the attorney would have provided the client had he or she not been personally interested in the transaction;[7]

(2) that the client fully understood the meaning and effect of the contract;

(3) that the client's understanding of the contract was the same as the attorney's;[8] and

(4) that the contract is just and reasonable.[9]

## III.

### REQUIREMENTS FOR CHARGING AND COLLECTING ATTORNEYS' FEES

■ An attorney's fiduciary obligations affect both the process used to set a fee and the amount of the fee itself. Restatement (Second) of Agency § 390 cmt. e (1957). Agreeing on the terms of compensation is an integral part of the employment process, and so Tenn.S.Ct.R. 8, EC 2–19 provides:

> As soon as feasible after a lawyer has been employed, it is desirable that he [or she] reach a clear agreement with his [or her] client as to the basis of the fee charges to be made. Such a course will not only prevent later misunderstanding but will also work for good relations between the lawyer and the client. It is usually beneficial to reduce to writing the understanding of the parties regarding the fee, particularly when it is contingent. A lawyer should be mindful that many persons who desire to employ him [or her] may have had little or no experience with fee charges of lawyers, and for this reason

he [or she] should explain fully to such persons the reasons for the particular fee arrangement he [or she] proposes.

Attorneys in Tennessee are accordingly encouraged, but not required, to enter into written employment contracts with their clients.[10] They are required, however, to see to it that their clients understand how the fee will be calculated and billed whether the contract is in writing or not. *Cooper & Keys v. Bell,* 127 Tenn. at 150–51, 153 S.W. at 846; *In re Estate of Davis,* 719 S.W.2d 526, 528 (Tenn.Ct.App.1986).

■ Courts will not enforce contracts for attorneys' fees that are contrary to public policy. *Newton v. Cox,* 878 S.W.2d 105, 108–09 (Tenn.), *cert. denied,* —— U.S. ——, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994) (contingent fee contract in excess of the statutory cap was unenforceable on the grounds of public policy). Likewise, courts may not enforce contracts for attorneys' fees if the attorney has breached his or her fiduciary obligations to the client and the breach has prejudiced the client's interests. *Crawford v. Logan,* 656 S.W.2d at 365; *Coleman v. Moody,* 52 Tenn.App. 138, 155, 372 S.W.2d 306, 313–314 (1963).

■ The general rules of contract law also apply to contracts between attorneys and clients. *In re Ellis,* 822 S.W.2d 602, 607 (Tenn.Ct.App.1991). Thus, the courts will construe ambiguities in a contract of employment against the attorney who prepared it. *Waller, Lansden, Dortch & Davis v. Haney,* App. No. 01–A–01–9101–CH–00019, slip op. at 6, 16 T.A.M. 27–18, 1991 WL 93813 (Tenn. Ct.App. June 5, 1991), *rev'd on other grounds,* 851 S.W.2d 131, 134 (Tenn.1992);

---

7. *Hutchinson v. Crowder,* 8 Tenn.Civ.App. (Higgins) 114, 119 (1917); Tenn.S.Ct.R. 8, EC 7–8 ("A lawyer should exert his [or her] best efforts to insure that the decisions of his [or her] client are made only after the client has been informed of relevant considerations.").

8. *Cooper & Keys v. Bell,* 127 Tenn. at 150, 153 S.W. at 846; *Planters' Bank v. Hornberger,* 44 Tenn. at 573.

9. *Cooper & Keys v. Bell,* 127 Tenn. at 150, 153 S.W. at 846; *Newman v. Davenport,* 68 Tenn. at 545.

10. A Tennessee Bar Association committee opposed a preliminary version of Rule 1.5(b) of the ABA Model Rules of Professional Conduct (1983) because it required the basis or rate of an attorney's fee to be communicated to the client in writing. *Report of the Committee of Code of Professional Conduct of the Tennessee Bar Association 1981–82,* Tenn.B.J., Aug. 1982, at 81, 82. The final version of Model Rule 1.5(b) does not require written contracts but rather provides that "[w]hen a lawyer has not regularly represented a client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation."

Charles W. Wolfram, *Modern Legal Ethics* § 9.2.1, at 503 (Practitioner's ed. 1986).

 Furthermore, the courts do not view the legal profession as merely a money-getting trade. *Attorney Grievance Comm'n. v. Kerpelman*, 292 Md. 228, 438 A.2d 501, 509 (1981). Attorneys are entitled to reasonable and adequate compensation for their services, *Spofford v. Rose*, 145 Tenn. 583, 611, 237 S.W. 68, 76 (1922); *Adams v. Mellen*, 618 S.W.2d 485, 488 (Tenn.Ct.App.1981); Tenn. S.Ct.R. 8, EC 2–16, but they are not entitled to a fee that is "clearly excessive." Tenn. S.Ct.R. 8, DR 2–106(A); EC 2–17.

 The reasonableness of a fee depends on the facts of each case, *Hail v. Nashville Trust Co.*, 31 Tenn.App. 39, 51, 212 S.W.2d 51, 56 (1948), not merely the prevailing custom in the area. *Adams v. Mellen*, 618 S.W.2d at 489. Determining whether a particular fee is reasonable requires consideration of the interests of the attorney and the client, Tenn.S.Ct.R. 8, EC 2–17, and all of the relevant circumstances, including those stated in the disciplinary rules. Tenn. S.Ct.R. 8, EC 2–18. Tenn.S.Ct.R. 8, DR 2–106(B) contains eight factors to be used as guides for determining the reasonableness of a fee:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

Tenn.S.Ct.R. 8, DR 2–106(B) has broad application. Its factors govern fees set by the courts. *Connors v. Connors*, 594 S.W.2d 672, 676–77 (Tenn.1980); *Ligon v. Ligon*, 556 S.W.2d 763, 768 (Tenn.Ct.App.1977); *Hall v. Davis*, App. No. 01–A–01–9404–CV–00146, slip op. at 4–5, 19 T.A.M. 41–7, 9 T.F.L.L. 1–5, 1994 WL 514139 (Tenn.Ct.App. Sept. 21, 1994);[11] *Caldwell v. Caldwell*, App. No. 88–11–II, slip op. at 8, 13 T.A.M. 34–16, 2 T.F.L.L. 11–7, 1988 WL 69506 (Tenn.Ct.App. July 6, 1988).[12] They are also used to determine the reasonableness of fee provisions in contracts, *Wilson Management Co. v. Star Distribs. Co.*, 745 S.W.2d 870, 873 (Tenn. 1988); *United Medical Corp. v. Hohenwald Bank & Trust Co.*, 703 S.W.2d 133, 136 (Tenn.1986), and to determine the reasonableness of a fee in the context of a dispute between an attorney and a former client. *Adams v. Mellen*, 618 S.W.2d at 489.

## IV.

### FEE ARRANGEMENTS DEPENDENT ON THE OUTCOME OF THE CASE

 Part of the process of determining how much to charge for legal services is selecting the method of compensation best suited to the combined interests of the attorney and the client. *See* Tenn.S.Ct.R. 8, EC 2–17. The Code of Professional Responsibility does not prescribe or recommend any particular fee arrangement. While hourly billing has been the overwhelmingly dominant fee arrangement for the past several decades,[13] other types of fee arrangements are also common.[14]

11. No permission to appeal filed.

12. No permission to appeal filed.

13. Robert E. Litan & Steven C. Salop, *Reforming the Lawyer–Client Relationship Through Alternative Billing Methods*, 77 Judicature 191, 191 (1994) ("Litan & Salop").

14. Explanations of these arrangements are found in [Manual] Laws. Man. on Prof. Conduct (ABA/BNA) 41:304 (1994); Litan & Salop, *supra*, at 194–96.

Contingent fee arrangements are the most common alternatives to hourly billing. Fees for legal services in litigation will generally be based on hourly billing, a contingent fee arrangement, or some combination of the two. *City of Burlington v. Dague*, 505 U.S. 557, ——, 112 S.Ct. 2638, 2640, 120 L.Ed.2d 449 (1992); Susan S. Samuelson, *Law Firm Management* § 6.2.7 (1994). While contingent fee arrangements have become commonplace in some fields of law such as personal injury litigation, the Code of Professional Responsibility still views contingent fees or contingent components in a fee as alternatives to standard hourly or fixed rates. Tenn.S.Ct.R. 8, EC 2–20 (a lawyer generally should decline to accept employment on a contingent fee basis by a client who is able to pay a reasonable fixed fee).

The Code of Professional Responsibility does not define the term "contingent fee arrangement." Our courts have likewise never defined the term, and an examination of the decisions in other jurisdictions does not reveal a succinct, common understanding of the term.

The word "contingent" is commonly understood to mean "of possible occurrence: likely but not certain to happen," Webster's Third New International Dictionary 493 (1971), or "[d]ependent on a pre-contemplated probability; provisionally liable to exist or take effect; conditional; not absolute." 3 The Oxford English Dictionary 826 (2d ed. 1989). The term "contingent fees" has been defined as an "[a]rrangement between attorney and client whereby attorney agrees to represent client with compensation to be a percentage of the amount recovered," Black's Law Dictionary 614 (6th ed. 1990), or as "a fee for services ... to be paid in the event of success in a particular transaction usu. as a specified percentage of the sum realized for the client or principal." Webster's Third New International Dictionary 493 (1971). Most jurisdictions would agree that a contingent fee arrangement is an agreement for legal services under which the amount or payment of the fee depends, in whole or in part, on the outcome of the proceedings for which the services were rendered.

Contingent fee arrangements serve a two-fold purpose. First, they enable clients who are unable to pay a reasonable fixed fee to obtain competent representation. *Moore v. Trustees of Campbell Academy*, 17 Tenn. (9 Yer.) 115, 118 (1836); Tenn.S.Ct.R. 8, EC 2–20; EC 5–7. Second, they provide a risk-shifting mechanism not present with traditional hourly billing that requires the attorney to bear all or part of the risk that the client's claim will be unsuccessful. *City of Burlington v. Dague*, 505 U.S. at 560, 112 S.Ct. at 2640; Samuelson, *supra*, § 6.2.3, at 6:13.

In circumstances where a client is unable to pay a regular hourly fee, the purpose of a contingent fee arrangement is to create a fund from which the fee can be paid at the conclusion of the proceedings. *Hall v. Davis*, *supra*, slip op. at 6; *Head v. Head*, 66 Md.App. 655, 505 A.2d 868, 875 (1986); Tenn. S.Ct.R. 8, EC 2–20. Contingent fees are generally higher than hourly fees, *Hail v. Nashville Trust Co.*, 31 Tenn.App. at 52, 212 S.W.2d at 56; *Eakin v. Peeples Hotel Co.*, 54 S.W. 87, 89 (Tenn.Chan.App.1899), because the attorney has assumed a significant degree of risk that he or she will not be compensated if the outcome is not successful. Wolfram, *supra*, § 9.4.2, at 532.

Contingent fee arrangements are uniquely American. F.B. MacKinnon, *Contingent Fees for Legal Services* 209 (1964); 1 Stuart M. Speiser, *Attorneys' Fees* § 2:1 (1973). Their early evolution in Tennessee is difficult to trace because of the lack of reported precedents. The Tennessee Supreme Court upheld their use over 150 years ago, *Moore v. Trustees of Campbell Academy*, 17 Tenn. at 118, and the courts have enforced them in personal injury and wrongful death cases without much discussion. *See, e.g., Sanders v. Riddick*, 127 Tenn. 701, 704, 156 S.W. 464, 464 (1913) (personal injury case); *Brownlow v. Payne*, 2 Tenn.App. 154, 162 (1925) (wrongful death case). On one occasion, the Tennessee Supreme Court declined to enforce a reverse contingent fee arrangement [15]

---

**15.** A reverse contingent fee arrangement entitles an attorney to a share of the amount of money

in a divorce case because of the absence of proof that the attorneys and the client had a mutual understanding concerning the fee. *Cooper & Keys v. Bell,* 127 Tenn. at 153, 153 S.W. at 847.

The use of contingent fee arrangements was refined and standardized in 1967 when the Tennessee Supreme Court adopted the American Bar Association's Canons of Professional and Judicial Ethics, Tenn.S.Ct.R. 38, 218 Tenn. 805, 842 (order filed Dec. 4, 1967), and later in 1975 when the Court adopted the Code of Professional Responsibility as amended by the ABA's Board of Governors through February 1975. Amendment to Rule 38, Tennessee Decisions, 530–533 S.W.2d at XXVII [16] (order filed Dec. 5, 1975). Tennessee is one of a relatively small number of jurisdictions that continue to regulate the practice of law using the Code of Professional Responsibility.[17] While the Tennessee Supreme Court has revised the Code of Professional Responsibility on five occasions, none of the changes affect the use of contingent fee arrangements. Accordingly, the rules and guidelines governing contingent fees in Tennessee have remained unchanged for the past twenty years.

■ Tenn.S.Ct.R. 8, DR 5–103(A)(2) permits attorneys to "[c]ontract with a client for a reasonable contingent fee in a civil case." [18]

These contracts must, however, satisfy four requirements in order to be valid:

(1) an attorney should propose a contingent fee only when the arrangement will be beneficial to his or her client; [19]

(2) an attorney must inform his or her client of all the relevant considerations concerning the use of a contingent fee arrangement; [20]

(3) an attorney should generally not propose a contingent fee arrangement to a client who is able to pay a reasonable fixed fee; and [21]

(4) the resulting contingent fee must be reasonable.[22]

The Code of Professional Responsibility tangentially addresses the use of contingent fee arrangements in domestic relations cases. Tenn.S.Ct.R. 8, EC 2–20 states that

Because of the human relationships involved and the unique character of the proceedings, contingent fee arrangements in domestic relation cases are rarely justified.

Since the Code of Professional Responsibility does not categorically prohibit contingent fee arrangements in domestic relations cases, the Board of Professional Responsibility has opined that "the acceptance of a contingent

the attorney's services save the client. [Manual] Laws. Man. on Prof. Conduct (ABA/BNA) § 41:305 (1994).

**16.** Tenn.S.Ct.R. 38 became the present Tenn. S.Ct.R. 8 when the Court revised its rules in 1981. In re Rules of the Supreme Court of Tennessee, Tennessee Decisions, 609–614 S.W.2d at XXVII, XLV (order effective Jan. 28, 1981).

**17.** The Model Code of Professional Responsibility (1969, revised 1980) has been replaced by the Model Rules of Professional Conduct (1983). Forty-one states and the District of Columbia now base their ethical standards on the model rules. [Manual] Laws. Man. on Prof. Conduct (ABA/BNA) 01:3–01:4 (1994).

In 1967, the president of the Tennessee Bar Association appointed a committee to study the model rules. *See Report of the Committee of Code of Professional Conduct of the Tennessee Bar Association 1981–82,* Tenn.B.J., Aug. 1982, at 81. In January 1985, the Board of Governors of the Tennessee Bar Association adopted the committee's recommendation against requesting the Tennessee Supreme Court to adopt the model rules after the committee's chairman reported

that he believed "the [Supreme Court] . . . was of the opinion that our current code is working adequately and that there should be no rush to otherwise adopt the model rules." Minutes of the Tennessee Bar Association's Board of Governors (Jan. 25, 1985) (on file at the offices of the Tennessee Bar Association).

**18.** Tenn.S.Ct.R. 8, DR 2–106(C) prohibits the use of contingent fee arrangements in criminal cases because, as stated in Tenn.S.Ct.R. 8, EC 2–20, "legal services in criminal cases do not produce a *res* with which to pay the fee."

**19.** Tenn.S.Ct.R. 8, EC 5–7.

**20.** Tenn.S.Ct.R. 8, EC 2–20; EC 7–8; *Hall v. Davis, supra,* slip op. at 4.

**21.** Tenn.S.Ct.R. 8, EC 2–20; *Hall v. Davis, supra,* slip op. at 4.

**22.** Tenn.S.Ct.R. 8, DR 2–106(B); DR 5–103(A)(2); EC 2–17; *Hall v. Davis, supra,* slip op. at 4.

fee in a domestic relations case will not, standing alone, warrant disciplinary sanctions." Board of Professional Responsibility of the Supreme Court of Tennessee, Formal Op. 82–F–26 (1982).[23] In a later advisory ethics opinion, the chief disciplinary counsel has stated that contingent fee arrangements in domestic relations cases are "heavily disfavored." Board of Professional Responsibility of the Supreme Court of Tennessee, Advisory Op. 90–A–408 (1990).[24]

The Board of Professional Responsibility's opinion, if correct, places Tennessee in the distinct minority of jurisdictions that permit contingent fee arrangements in domestic relations cases. Most jurisdictions hold that it is improper to charge a fee in domestic relations cases that is either contingent on a favorable judgment or settlement or proportional to the recovery of alimony, child support, or marital property. *See e.g., Guenard v. Burke*, 387 Mass. 802, 443 N.E.2d 892, 895 (1982); *Thompson v. Thompson*, 70 N.C.App. 147, 319 S.E.2d 315, 321–22 (1984), *rev'd on other grounds*, 313 N.C. 313, 328 S.E.2d 288, 290 (1985); Wolfram, *supra*, at § 9.4.4; [Manual] Laws. Man. on Prof. Conduct (ABA/BNA) 41:914–917 (1994). The most often stated reasons for this prohibition are:

> 1) the public policy favoring marriage; 2) disapproval of giving attorneys a financial incentive to promote divorce; 3) the statutory availability of attorney fee awards making contingent fees unnecessary; 4) the potential for over-reaching or undue influence in a highly emotional situation; and 5) a need for the court to make an informed distribution of property which includes the obligation of attorney fees.

*Meyers v. Handlon*, 479 N.E.2d 106, 109 (Ind.Ct.App.1985); *In re Jarvis*, 254 Kan. 829, 869 P.2d 671, 674 (1994); *Thompson v. Thompson*, 319 S.E.2d at 320.

The majority rule has now been codified in the Model Rules of Professional Conduct. *See* 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 1.5 at 120 (2d ed. 1990). Model Rule 1.5(d)(1) provides that an attorney shall not enter into an arrangement for, charge, or collect "any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or upon the amount of alimony or support, or property settlement in lieu thereof." The only relaxation of this rule has occurred in cases involving post-divorce proceedings in which a spouse is attempting to collect arrearages in alimony or child support, or attempting to enforce orders dividing the marital estate that have already become final. *See, e.g., In re Struthers*, 179 Ariz. 216, 223 n. 4, 877 P.2d 789, 796 n. 4 (1994), *E.g., Fletcher v. Fletcher*, 227 Ill.App.3d 194, 169 Ill.Dec. 211, 214, 591 N.E.2d 91, 94 (1992).[25]

The policy reasons for prohibiting the use of contingent fee arrangements in domestic relations cases are compelling. Tenn.S.Ct.R. 8, EC 2–20 suggests, however, that these arrangements are permissible in domestic relations cases in certain circumstances. Accordingly, in the absence of more definitive direction from the Supreme Court, we decline to hold categorically that attorneys may not enter into contingent fee arrangements in domestic relations cases where the payment or the amount of the fee is, in whole or in part, contingent on securing the divorce or on the amount of spousal support, child support, or marital property.

Since attorneys do not have an unrestricted right to enter into contingent fee arrangements, the courts retain their prerogative to satisfy themselves that contingent fees are reasonable. *Hall v. Davis*

---

23. Tenn.S.Ct.R. 9, § 26.4 permits the ethics committees of the Board of Professional Responsibility to issue formal ethics opinions on proper professional conduct. These opinions are binding on the committee and "constitute a body of principles and objectives upon which members of the bar can rely for guidance in many specific situations." Tenn.S.Ct.R. 9, § 26.5(a). They are not binding on the courts.

24. Advisory ethics opinions by the chief disciplinary counsel are not binding and offer no security to the person requesting them. Tenn.S.Ct.R. 9, § 26.5(c).

25. This court authorized the used of a contingent fee arrangement to collect accrued child support in cases where the children were adults or where the custodial spouse was seeking reimbursement for funds already expended. *Hall v. Davis, supra*, slip op. at 6.

prescribes several of the requirements for using contingent fee arrangements, and we continue with that process here. Trial courts should require attorneys who wish to enter into a contingent fee arrangement in a divorce case to submit the agreement for approval prior to considering the merits of the divorce case. While the trial courts may determine the most efficient way to review the fee arrangement, they should approve the agreement only if the attorney demonstrates:

1. That the client is currently unable to pay a reasonable fixed fee or will be unable to pay a reasonable fixed fee from his or her anticipated share of the marital property or from an award of alimony or spousal support; or

2. That the opposing party cannot pay reasonable pendente lite attorneys' fees pursuant to Tenn.Code Ann. §§ 36–5–101(i), –103(c) (Supp.1994) or an award for attorneys' fees at the conclusion of the case.

In addition, the attorney must demonstrate:

3. That the attorney has explained all relevant considerations to the client, including the availability of other fee or payment arrangements and the client's right to seek independent legal advice;

4. That the client fully understands his or her obligations under the agreement; [26]

5. That the attorney has agreed to credit any court-awarded fees against his or her final fee; and

6. That the arrangement is fair and reasonable and is in the client's best interests.

If the trial court does not approve the contingent fee arrangement, it shall set a reasonable fee at the conclusion of the case using the relevant factors in Tenn.S.Ct.R. 8, DR 2–106(B) and shall determine, in accordance with Tenn.Code Ann. §§ 36–5–101(i), –103(c), what portion of the fee, if any, should be paid by the opposing party.

---

[26] A written contract signed by the client will materially assist an attorney in demonstrating that the client understands his or her obligations. Persons who sign a written document are presumed to know and understand its contents.

## V.

### TIME RECORDS AS BUSINESS RECORDS

Ms. Inman takes issue with the trial court's decision to permit Mr. Davis to base his testimony concerning the amount of time he spent representing her on his firms' time records. She asserts that Mr. Davis "did not have any idea how the information was actually collected and prepared." The record does not bear out this claim, and therefore, we concur with the trial court's conclusion that Mr. Davis could testify from these records.

### A.

Mr. Davis considered the time and labor required to represent Ms. Inman when he calculated her final fee. His testimony concerning the time and labor required was based, at least in part, on a computer printout of the time records from the two law firms where he worked while representing Ms. Inman.

Ms. Inman's attorney objected to Mr. Davis's testimony concerning these records on the ground that Mr. Davis had not laid a proper foundation under Tenn.R.Evid. 803(6). In response, Mr. Davis testified that the attorneys at both his former and present firms kept time records in the ordinary course of the firms' business. He explained that "the person who does the work writes down on a piece of paper the name of the case they're working on, the date and what they did and how many tenths of an hour it took" and that each slip is "turned in periodically and is recorded on a computer as a retrievable record of the time." He also explained that all the work on Ms. Inman's case was performed under his direction and supervision and, therefore, that he had access to his associates' time records in addition to his own. He added that he had requested both firms to provide him computer printouts of their records of the time spent on Ms. Inman's case.

*Beasley v. Metropolitan Life Ins. Co.,* 190 Tenn. 227, 232, 229 S.W.2d 146, 148 (1950). In addition to being in an attorney's interest, using a written contract for a contingent fee arrangement is consistent with Tenn.S.Ct.R. 8, EC 2–19.

Ms. Inman's attorney renewed his objection, stating that "[a] statement purportedly made by some unnamed person on a time sheet that is then given to some unnamed time collector and in some undisclosed method goes into a computer to be recorded in some ungiven program is the rankest of multiple hearsay." The trial court overruled the objection, and Mr. Davis testified that he and his associates recorded 775 hours of work on Ms. Inman's case.[27]

### B.

■ Tenn.R.Evid. 803(6) embodies the exception to the hearsay rule commonly known as the business records exception. It rests on the premise that records regularly kept in the normal course of business are inherently trustworthy and reliable. *Hill v. National Life & Accident Ins. Co.,* 11 Tenn. App. 33, 37–38 (1929); 5 John H. Wigmore, *Evidence in Trials at Common Law* § 1522 (James H. Chadbourn rev. 1974); Neil P. Cohen et al., *Tennessee Law of Evidence* § 803(6).1 (2d ed. 1990) ("Tennessee Law of Evidence"). Its purpose, like that of its predecessor,[28] is to facilitate the use of business records by eliminating the expense and inconvenience of calling numerous witnesses involved in the preparation and maintenance of the records. *Graham v. State,* 547 S.W.2d 531, 538 (Tenn.1977); *Kanipes v. North Am. Phillips Elecs. Corp.,* 825 S.W.2d 426, 428 (Tenn.Ct.App.1991); *West End Recreation, Inc. v. Hodge,* 776 S.W.2d 101, 105 (Tenn.Ct. App.1989).

The documents themselves must satisfy the following five criteria in order to qualify for introduction under Tenn.R.Evid. 803(6):

1. The document must be made at or near the time of the event recorded;

2. The person providing the information in the document must have firsthand knowledge of the recorded events or facts;

3. The person providing the information in the document must be under a business duty to record or transmit the information;

4. The business involved must have a regular practice of making such documents; and

5. The manner in which the information was provided or the document was prepared must not indicate that the document lacks trustworthiness.

In addition, Tenn.R.Evid. 803(6) requires that the foundation for the admission of a business record must be provided by "the custodian or other qualified witness."

■ We disagree with Ms. Inman's assertion that Mr. Davis was not a qualified witness. The term "qualified witness" should be given a broad interpretation. *United States v. Console,* 13 F.3d 641, 657 (3d Cir.1993); *Williams v. Hittle,* 629 N.E.2d 944, 949 (Ind.Ct.App.1994); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 803(6)[02] (1994). To be considered qualified, a witness must be personally familiar with the business's record-keeping systems and must be able to explain the record-keeping procedures. *United States v. Hathaway,* 798 F.2d 902, 906 (6th Cir.1986); *Cole Oil & Tire Co. v. Davis,* 567 So.2d 122, 129 (La.Ct.App.1990); *Ohio v. Vrona,* 47 Ohio App.3d 145, 547 N.E.2d 1189, 1194 (1988); *Shaw v. Texas,* 826 S.W.2d 763, 765 (Tex.Ct. App.1992); Tennessee Law of Evidence, *supra,* § 803(6).10 ("[t]he key is that the witness have knowledge of the method of preparing and preserving the records"). The witness is not required to have personal knowledge of the facts recorded, *Fawer, Brian, Hardy & Zatzkis v. Howes,* 639 So.2d 329, 330 (La.Ct.App.1994), to have been involved personally in the preparation of the records, or even to know who actually recorded the information. *Resolution Trust Corp. v. Eason,* 17 F.3d 1126, 1132 (8th Cir. 1994).

■ Courts have consistently found a law firm's time records to be business records

---

27. While Mr. Davis clearly relied on the computer printouts of the time records during his testimony, they were never made exhibits in this case. The transcript does not indicate whether they were not introduced through oversight or by design.

28. Uniform Business Records as Evidence Act, Tenn.Code Ann. § 24–7–111 (repealed 1991).

under Rule 803(6). The rule does not require attorneys with overall responsibility for representing a client to have personally recorded all the time sheets, *Hardesty v. Corrova*, 27 Ohio App.3d 332, 27 OBR 389, 501 N.E.2d 81, 85 (1986), or to have personal knowledge of the facts contained in each time slip. *Fawer, Brian, Hardy & Zatzkis v. Howes*, 639 So.2d at 330; *Chadwick–BaRoss, Inc. v. Martin Marietta Corp.*, 483 A.2d 711, 716 (Me.1984). These attorneys are qualified if they have personal knowledge of the firm's billing practices and the manner in which the account records were prepared and maintained.

■ Mr. Davis was the lead attorney in Ms. Inman's case at both firms, and accordingly he directed and supervised all the work on her behalf. He explained the time-keeping system in general terms. Tenn.R.Evid. 803(6) does not require him to examine each individual time slip, to identify the administrative personnel responsible for collecting, recording, and maintaining the time slips, to identify each firm's billing and time-keeping software, or to explain the intricacies of the firms' computer systems.

■ The computer printouts upon which Mr. Davis based his testimony were typical of those normally available to attorneys in both firms. They were admissible under Tenn.R.Evid. 803(6) because Mr. Davis demonstrated that the attorneys in both firms regularly prepared time records, that the records were prepared at or near the time the service was provided, that the attorneys preparing the records had personal knowledge of the facts recorded, and that the firms maintained the time records in the usual course of their business. The fact that the computer printouts were prepared in response to a discovery request does not undermine their trustworthiness because the printouts themselves and the information on the printouts were records of a regularly conducted business activity.

## VI.

### EXCLUSION OF EVIDENCE OF DUPLICATION OF LEGAL SERVICES

Ms. Inman also asserts that the trial court should have permitted her to introduce summaries of her three principal attorneys' time records to demonstrate the duplication of their services. The trial court excluded the evidence on the grounds that it would not substantially assist the triers of fact, that it was not trustworthy, and that its probative value was outweighed by the unfair risk of prejudice. We have determined that the trial court should have admitted the evidence and that the decision to exclude it was reversible error.

### A.

■ The contract for legal services, echoing Tenn.S.Ct.R. 8, DR 2–106(B)(1), required that the final fee would be based, in part, on "the time and labor required." Messrs. Alexander and Davis had the burden of proving that their fee was reasonable. It was, therefore, incumbent on them to prove that the time they spent representing Ms. Inman was reasonable and required.

Both Messrs. Williams and Davis testified concerning the services provided to Ms. Inman. Mr. Alexander did not testify at trial because of health problems. Mr. Williams testified that he and Mr. Alexander spent approximately 500 hours on Ms. Inman's case; while Mr. Davis testified that he and his associates spent at least 775 hours. Mr. Davis added that he worked more on Ms. Inman's case than he had on any other case except one and that many hours he spent working on the case at night or on the weekends were never recorded.

Ms. Inman's attorney cross-examined both Messrs. Williams and Davis concerning the necessity and duplication of their services both at trial and on appeal. He also proposed to present additional evidence of the duplication of the three principal attorneys' services based on their own time records. The evidence consisted of six charts that summarized the time records provided by Messrs. Alexander, Davis, and Williams during discovery. These charts illustrated (1) the number of hours each attorney recorded during each phase of the proceeding; (2) the amount of time recorded by each attorney for

telephone calls or conferences with co-counsel; (3) the amount of time recorded by each attorney for preparing letters to co-counsel; and (4) the charges for these services had the attorneys been billing Ms. Inman at their regular hourly rate.

 The charts were prepared by a certified public accountant. The accountant testified that the data for the charts came from the attorneys' own time records and that the charts included all the information concerning Messrs. Alexander, Davis, and Williams that had been included in the time records. He also explained the simple arithmetic process he used in his calculations. The accountant did not intend to give an opinion concerning whether the hours billed by each attorney were reasonable or required or whether the attorneys' services were inappropriately duplicative.

The attorney for Messrs. Alexander and Davis objected to this evidence on the grounds of relevancy. The trial court apparently determined that the evidence was relevant but decided under Tenn.R.Evid. 403 that the risk of unfair prejudice outweighed its probative value. The trial court also decided under Tenn.R.Evid. 702 and Tenn. R.Evid. 703 that the summaries lacked trustworthiness and would not substantially assist the trier of fact. Accordingly, it declined to admit the charts and instructed the jury to disregard the accountant's testimony.

### B.

The trial court should not have excluded the summaries of the time records. They were straightforward compilations of the attorneys' own time records that had already been found to be business records under Tenn.R.Evid. 803(6). The time records themselves were trustworthy, and the arithmetic procedure used to summarize them was not inherently suspect and did not undermine the summaries' reliability.

The time records themselves were apparently voluminous and not easily susceptible to convenient examination and analysis by the jury. Tenn.R.Evid. 1006 permits the use of summaries of voluminous records, and we find that summaries of the time records

would have substantially assisted the jury in determining whether the fee was reasonable in light of the time and labor required and whether the fee was in line with the customary charges in the locality for similar legal services. Messrs. Alexander and Davis had already used these records to justify their fee, and so it was not unfairly prejudicial for Ms. Inman to use accurate summaries of the same records to illustrate that the fee was, in part, based on duplicative services.

### C.

 The time that Messrs. Alexander, Davis, and Williams spent on Ms. Inman's case was a material element of their claim for attorneys' fees. Their fee could only have been based on required services. Unreasonably duplicative, unnecessary, or excessive services should never be considered in determining a reasonable attorneys' fee. *See, e.g., Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952–53 (1st Cir.1984) (no justification for two top echelon attorneys at every oral argument); *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980) (compensation should be denied where three attorneys were present at a hearing when one would suffice); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974) (the time of two or three attorneys in court or in conferences could be discounted when one attorney would do); *Tomaino v. Tomaino,* 629 So.2d 874, 875 (Fla.Dist.Ct.App.1993) (courts should not award fees for duplicative efforts); *Freeman v. Crown City Mining, Inc.,* 90 Ohio App.3d 546, 630 N.E.2d 19, 23 (1993) (hours are unreasonable when they are excessive in relation to the work done, are duplicative or redundant, or are simply unnecessary); *Perlberger v. Perlberger,* 426 Pa.Super. 245, 626 A.2d 1186, 1207 (1993) (excessive duplication of work is grounds for denying a requested fee award in a divorce case).

The evidence, viewed together with Ms. Inman's tender of proof, raises substantial questions concerning duplicative and unnecessary services. Ms. Inman expressed concern about duplication during her first meeting with Mr. Alexander when he suggested bringing Mr. Davis into the case. From September 6, 1988 through July 1, 1991, Ms.

Inman's attorneys recorded 1,275 hours of work on her case without ever providing her with a statement of their services—803.6 of these hours were billed by her three principal attorneys.

As many as six attorneys were involved in the pretrial preparation of Ms. Inman's case. Messrs. Davis and Williams, who were primarily responsible for preparing and trying the case, recorded 97.4 and 98.8 hours respectively. Although Mr. Alexander recorded 91.3 hours, the record does not indicate what services he provided other than preparing the employment agreement and meeting with Ms. Inman on September 6, 12, and 22, 1988.

Messrs. Alexander, Davis, and Williams each recorded 33.8 hours for representing Ms. Inman during the three-day divorce trial. The transcript of the trial demonstrates that Messrs. Davis and Williams were actively involved with the trial but that Mr. Alexander played only a peripheral role at most. Mr. Alexander's own partner conceded that either he or Mr. Davis could have tried the case by themselves and that Mr. Alexander's role at trial was limited.

All three principal attorneys participated in the appeal to this court and recorded a total of 211.65 hours. Mr. Davis took the lead in preparing the brief filed in this court and argued the case. Messrs. Alexander and Williams were responsible for preparing one portion of Ms. Inman's brief. Mr. Davis recorded 120.6 hours; Mr. Williams recorded 62.2 hours; and Mr. Alexander recorded 28.85 hours. The record contains no information concerning the nature of the services Mr. Alexander provided on appeal or how his services differed from those provided by Mr. Williams.

All three principal attorneys also participated in the proceedings before the Supreme Court and recorded a total of 193.75 hours. The proceedings before the Supreme Court consisted of filing an application for permission to appeal, preparing a brief, filing several unsuccessful procedural motions, presenting oral argument, and filing an unsuccessful petition for rehearing. Mr. Davis again took the lead in preparing the documents and in arguing the case. He recorded 121.4 hours, while Messrs. Alexander and Williams recorded 17.15 and 55.2 hours respectively. The record does not indicate clearly what services Messrs. Alexander and Williams provided in the proceedings before the Supreme Court.

Five attorneys representing Ms. Inman attended the oral argument before the Supreme Court, even though only Mr. Davis presented oral argument on her behalf. The entire argument did not exceed ninety minutes, but two of Mr. Davis' associates recorded 3.0 hours and 3.5 hours respectively for attending the argument. Mr. Davis could not remember what these attorneys did during the oral argument and could not explain why their presence was required since both Messrs. Alexander and Williams were also present.

The time recorded by Mr. Davis's associates accounted for 471.40 hours—approximately one-third of the total recorded hours. These associates reviewed unspecified documents in the Williamson County register's office, researched Mr. Inman's transactions involving the stock of a Knoxville bank, and performed other unspecified services in Memphis and Chattanooga. Paralegals also summarized depositions and compiled documents. The explanation of many of these services is so general that no finder of fact would be able to determine whether they were required or reasonable.

The time records of Ms. Inman's three principal attorneys indicate that they recorded 131.25 hours—over ten percent of the recorded time—for telephone calls and conferences among themselves. In addition, Mr. Williams recorded 34.65 hours for correspondence involving Mr. Davis. A trier of fact could properly consider whether this intra-counsel communication was required and whether basing the final bill, in part, on these recorded hours was reasonable.

 In light of the substance of the tendered evidence, we cannot conclude that the trial court's decision to exclude the accountant's testimony was harmless error. The jury could have concluded from the excluded evidence that portions of the legal services Ms. Inman received were not required and,

therefore, that her attorneys' final fee was not reasonable. Accordingly, we must reverse the judgment and remand the case for a new trial.

## VII.

### THE JURY INSTRUCTIONS

■ We turn now to the jury instructions. Even though the Supreme Court has discouraged the use of juries in cases of this sort, *Cooper & Keys v. Bell*, 127 Tenn. at 153, 153 S.W. at 847, the parties have an absolute right to a jury trial and a general verdict since breach of contract actions are not inherently equitable. We perceive no basis for distinguishing an action for breach of a contract for attorneys' fees from other breach of contract actions. The trial court has no more supervisory control over the verdict than any other breach of contract case tried to a jury. The trial court, in its role as the thirteenth juror, may determine whether the evidence was sufficient to support the verdict and may suggest an additur or remittitur in accordance with Tenn.Code Ann. §§ 20–10–101, 20–10–102 (1994).

■ Determining whether a fee for legal services is reasonable requires a familiarity with the practice of law and a careful balancing of the numerous factors affecting the reasonableness of a fee. Accordingly, the jury instructions must accurately embody the parties' theories and the legal principles applicable thereto. *Tuggle v. Raymond Corp.*, 868 S.W.2d 621, 626 (Tenn.Ct.App.1992); *Lorentz v. Deardan*, 834 S.W.2d 316, 319 (Tenn.Ct.App.1992). They must also be presented in a way that will be readily understandable to the jury. *Sasser v. Averitt Express, Inc.*, 839 S.W.2d 422, 430 (Tenn.Ct.App.1992).

■ The instructions used in this case, while correct, did not go far enough to provide the jury with the legal guidance needed to enable them to deal fairly with the elusive issue of the reasonableness of the attorneys' fees. Accordingly, the instructions should be amplified when the case is retried. In order to conform to this opinion,

the charge should include instructions addressing the following points:

1. An explanation and description of the nature of the attorney-client relationship.

2. An explanation of the meaning and significance of a fiduciary relationship.

3. A description of an attorney's obligations to a client when contracting for a fee.

4. An explanation that attorneys may not contract for or attempt to collect a clearly excessive fee.

5. An instruction that the Supreme Court has prescribed how to determine whether a fee is clearly excessive and a recitation of the factors in Tenn. S.Ct.R. 8, DR 2–106(B) applicable to the case.

6. An instruction that Tenn.S.Ct.R. 8, DR 2–106(B) provides that a fee is clearly excessive if an attorney of ordinary prudence is left with a definite and firm conviction that the fee is in excess of a reasonable fee. Accordingly, the jurors should not attempt to apply the factors in Tenn.S.Ct.R. 8, DR 2–106(B) on their own but rather should base their decision on the opinions presented by the parties.

7. An instruction that an attorney has the burden of proving (A) that the negotiations and fee agreement were consistent with the attorney's fiduciary obligations, (B) that the attorney provided the services contracted for, and (C) that the fee being sought is reasonable.

8. An instruction that if the terms of the agreement are vague, they should be construed against the attorney if the attorney drafted the contract.

9. An instruction that an attorney may not enforce a contract if the negotiation process was inconsistent with the attorney's fiduciary obligations or if the fee is unreasonable but that an attorney is entitled to recover the reasonable value of his or her services even if the contract is unenforceable or the contract fee is unreasonable.[29]

---

**29.** Unlike other jurisdictions, Tennessee permits attorneys whose fee contracts are unenforceable

The trial court should also instruct the jury concerning the proper decision-making process and should provide the jury with appropriate interrogatories to aid them in their deliberations. The jury should first determine whether the attorney's contract is enforceable. If the contract is enforceable, then the jury must determine whether the attorney provided the contemplated services. If the attorney has provided the contemplated services, then the jury must determine whether the requested fee is reasonable. If the jury finds that the contract is enforceable, that the attorney performed the contemplated services, and that the fee is reasonable, then the jury should award the attorney the contract fee. If, however, the jury finds either that the contract is unenforceable or that the fee is unreasonable, then the jury should determine the reasonable value of the attorney's services. The jury should determine the reasonable value of the services without speculation and in light of the evidence.[30]

## VIII.

We reverse the judgment and remand the case for another trial. We pretermit the remaining issues in light of our disposition of the evidentiary issues and the issues involving the adequacy of the instructions. We also tax the costs of this appeal in equal proportions against the plaintiffs for which execution, if necessary, may issue.

TODD, P.J., concurs.

LEWIS, J., concurs in result only.

to recover the reasonable value of their services. *Cooper & Keys v. Bell,* 127 Tenn. at 153, 153 S.W. at 847; *Planters' Bank v. Hornberger,* 44 Tenn. at 577; *Cummings v. Patterson,* 59 Tenn.App. at 541, 442 S.W.2d at 643.

**30.** The question of the reasonable value of an attorney's services differs from the question concerning whether a fee is reasonable under Tenn. S.Ct.R. 8, DR 2–106(B).