IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 20, 2000

## STATE OF TENNESSEE v. MICHAEL BRADY

**Appeal from the Circuit Court for Williamson County**
**No. II-798-239-A      Timothy L. Easter, Judge**

---

**No. M1999-02253-CCA-R3-CD - Filed January 12, 2001**

---

The Defendant was convicted of robbery and two counts of attempted aggravated robbery.  On this appeal as of right, the Defendant challenges several of the trial court's evidentiary rulings, arguing that the audio tapes of the victims' prior testimony should have been admitted; that his prior conviction of aggravated assault, and questions thereon, should not have been admitted; that certain photographs of the crime scene should have been admitted; that his special education records were admissible; and that certain police reports should have been admitted.  The Defendant also argues that he was entitled to a mistrial.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOE G. RILEY and NORMA MCGEE OGLE, JJ., joined.

John T. Conners, III, Franklin, Tennessee, for the appellant, Michael Brady.

Paul G. Summers, Attorney General and Reporter; Marvin E. Clements, Jr., Assistant Attorney General; Ron Davis, District Attorney General; and Lee Dryer, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant, Michael Brady, Jr., was indicted for one count of aggravated robbery and two counts of attempted aggravated robbery.  A jury convicted him of the lesser offense of robbery and of the attempted aggravated robberies as charged.  The trial court sentenced him as a Range I, standard offender to six years incarceration for the robbery and to six years incarceration for each of the attempted aggravated robberies, all concurrent with one another.  In this appeal as of right, the Defendant raises the following issues:

> 1. Whether the trial court erred in ruling inadmissable audio tapes
> from the preliminary hearing;

2. Whether the trial court erred in its rulings on the State's use of the Defendant's prior conviction;

3. Whether the trial court erred in ruling inadmissible certain photographs tendered by the Defendant;

4. Whether the trial court erred in ruling inadmissible the Defendant's special education records;

5. Whether the trial court erred in ruling inadmissible certain police reports;

6. Whether the trial court erred in refusing to grant a mistrial; and

7. Whether the cumulative effect of the errors deprived the Defendant of a fair trial.

Upon our review of the record and relevant legal authority, we affirm the judgment of the trial court.

## FACTS

On the evening of June 11, 1998, the Defendant and Jesse Smithson were drinking and driving around Williamson County in the Defendant's Bronco. The Defendant was driving, and he pulled over on the side of Carter's Creek Pike just past the Thompson's Station intersection to relieve himself. As he was standing by his truck, a white Cougar passed. The Cougar was driven by Brandon King with Larry Howell, Jr. as a passenger. The Defendant tried to flag the car down. The Cougar did not stop, but turned around after passing the Defendant and drove back in the other direction along Carter's Creek Pike, eventually turning left onto Perkins Road.

The men in the Cougar were attempting to catch up with a friend of theirs, Shawn Pilkinton. Pilkinton had been following the Cougar in his own car but had stopped and turned around at Perkins Road. Pilkinton was waiting at the intersection of Carter's Creek Pike and Perkins Road for King and Howell to rejoin him. When the Cougar pulled alongside, Pilkinton told them to turn around because he wanted to return home. As the Cougar was turning around, the Bronco pulled up in the middle of the intersection, blocking Pilkinton. The Cougar was also blocked. According to Pilkinton, the Defendant and Smithson got out of the Bronco, and Smithson approached his car while the Defendant went to the Cougar.

Pilkinton testified that Smithson asked him if he knew the men in the Cougar, to which Pilkinton responded, "No." Smithson then held a knife to Pilkinton's throat and told him not to move. Smithson asked Pilkinton if he had any money, and Pilkinton gave him two twenty dollar bills and one five dollar bill. Smithson stood there a short time longer and then told Pilkinton to leave. Pilkinton did so, driving onto the shoulder so as to maneuver around the Bronco. As he left he saw Smithson walking toward the Cougar, but did not see what happened.

Howell testified that the Defendant approached the Cougar and put his hands down on the windowsill of the driver's door (the window was down). The Defendant started questioning them, asking them why they had not stopped for him earlier. He then told them to wait for his friend. Smithson then came up to the driver's side of the car and started asking questions. As the Defendant stood there with Smithson, Smithson brought out a knife and put it to King's throat, demanding money and threatening to kill them. Howell testified that the Defendant wanted money too. King said, "he's got money," and pointed to Howell. Howell told Smithson and the Defendant that he did not have any money. Apparently, the Defendant and Smithson believed Howell because they then told King and Howell to "get out of here or you're gonna get killed." King and Howell left.

King's testimony was very similar to Howell's. He stated that the Defendant appeared as though something was bothering him, and was asking questions when Smithson appeared. While Smithson was demanding money, King said, the Defendant was more or less just standing there.

After King and Howell left the scene, they caught up with Pilkinton who had pulled over on the side of the road to wait for them. They all headed toward Franklin and stopped at a small market where they saw some police cars. They stopped and told the police what had happened. As they were talking, they saw the Bronco drive by and pointed it out to the police. Lt. Cagle gave chase and pulled the Bronco over. The Defendant was still driving. Smithson jumped out of the vehicle and ran, with Lt. Cagle in pursuit. The Defendant cooperated with the police. When he was patted down, an officer pulled a twenty dollar bill from his front pocket.

The Defendant was taken to the station for questioning and gave an oral and written statement to Detective Hagan. Hagan testified that the Defendant told him that he and Smithson had been drinking and were broke. When they stopped on Carter's Creek Pike, a vehicle came by and they followed it up to Perkins. They stopped and the Defendant spoke with the people in one of the cars. Hagan testified that the Defendant told him that he did not know that Smithson had robbed anyone until after they were back in the Bronco. Hagan said that the Defendant told him that Smithson had then given the Defendant twenty dollars. Hagan testified that the Defendant refused to answer his question of whether the twenty dollars had come from the robbery.

The Defendant's written statement was also admitted into evidence. In it, the Defendant described where he and Smithson had gone that night. He stopped at Perkins Road, according to this statement, to use the restroom again. His statement continues:

> [Smithson] was talking to some guy in a black car. I got back in my Bronco and [Smithson] run and the white car almost hit my truck. I ask[ed] [Smithson] what happen[ed] he said he had rob[bed] them. Then we drove on to town by Jwells [sic] market. The county and city police were there. The passenger side window was down I heard some one say there they are. When I seen blue lights [Smithson] thr[ew] out a knife I had in the truck. It was not the one he had.

The Defendant testified that when the white Cougar initially passed him as he was pulled off on the side of Carter's Creek Pike at Thompson's Station, he "heard something." Smithson told the Defendant that he thought the men in the car had cursed them as they drove by. The Defendant became angry and when the white car turned around and began driving back toward the Bronco, the Defendant threw up his hands and said, "What's up?" The Defendant testified that he thought there was going to be a fight, and he became even angrier when the white car did not stop. He turned the Bronco around and saw the white car's taillights about a mile later at Perkins Road. Wanting an explanation from its occupants, he "whipped" the Bronco into the intersection and got out, shutting his door but leaving his lights on. He testified that he did not know that his Bronco was blocking the victims' cars. He went to the white car, leaned on the driver's windowsill, and asked the men inside what they were doing. According to the Defendant, the men answered that they were racing the other car. This was the first time, the Defendant said, that he noticed Pilkinton's car. When he looked at Pilkinton's car, he saw Smithson talking to the driver.

The Defendant spoke to Howell and King for about a minute before Smithson arrived. The Defendant denied telling King and Howell to wait for Smithson. The Defendant concluded that Howell and King were not going to fight him. Smithson came to the window and asked who they were and where they went to school. At some point, the Defendant testified, one of them said that they knew a man named Don Jr. The Defendant thought Don Jr. was a police informant and worried that he would be reported. The Defendant was on probation at this time and was concerned that he would be found in violation. Accordingly, when he heard the name, he decided to leave. He backed away from the car's window and headed to the Bronco.

The Defendant testified that he did not participate in robbing or attempting to rob the victims, and he did not know that Smithson intended to rob them. He testified that he never saw Smithson pull a knife and did not know anything about the robbery until he and Smithson were back in the Bronco and headed back to town. Smithson then told him that he had robbed the men. He testified that he did not take twenty dollars from Smithson and already had twenty-seven dollars in his pocket. He denied telling Hagan that he had taken twenty dollars from Smithson.

Connie Brady, the Defendant's wife, testified that she spoke with Brandon King at Jewel's Market as the victims were reporting the offenses to the police. She stated that King had told her that, while Smithson was trying to rob them, the Defendant had been stuttering and then had just turned and gotten back in his truck. Brady testified that King told her that the Defendant did not demand any money.

## ADMISSIBILITY OF PRIOR STATEMENTS

At the beginning of the Defendant's case in chief, defense counsel attempted to introduce as substantive evidence the audio tapes of the victims' testimony during the preliminary hearing. The asserted purpose of introducing these tapes was to demonstrate inconsistencies in the victims' testimony. The State objected on the basis of hearsay and defense counsel responded that the tapes were admissible under Tennessee Rule of Evidence 613(b). That Rule provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is

afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Id. The trial court explained to defense counsel that the audio tapes could have been used for impeachment purposes during cross-examination of the witnesses, but that the tapes could not be admitted as substantive evidence as defense counsel was trying to do. The trial court was correct. Moreover, even if the trial court erred in ruling this evidence inadmissible, the error was harmless. Defense counsel thoroughly cross-examined the victims about their prior inconsistent statements made at the preliminary hearing, and the jury was thereby given an opportunity to judge the credibility of the victims' trial testimony. This issue is without merit.

## ADMISSIBILITY OF DEFENDANT'S PRIOR CONVICTION

Prior to the Defendant testifying, the trial court conducted a hearing to determine whether the State could impeach the Defendant with his prior felony conviction for aggravated assault. See Tenn. R. Evid. 609(a). The court ruled that the prior conviction was admissible, and the Defendant now complains that the trial court's decision was error. We disagree.

The Defendant was convicted of aggravated assault in 1996. Such a conviction is admissible for impeachment purposes if the court determines that the probative value of the conviction on the Defendant's credibility outweighs the unfair prejudicial effect of the conviction on the substantive issues at trial. See Tenn. R. Evid. 609(a)(3). The trial court made no specific findings with respect to this balancing test, but did rule the conviction admissible. We will not reverse the trial court's ruling absent an abuse of discretion. See State v. Blevins, 968 S.W.2d 888, 892 (Tenn. Crim. App. 1997).

In determining the probative value of a prior conviction, a court must assess the similarity between the offense on trial and the crime underlying the impeaching conviction. Id. at 893. The court must then determine the relevance of the impeaching conviction to the defendant's credibility. Id. In this case, there is some similarity between aggravated assault and aggravated robbery. Aggravated assault involves a defendant causing serious bodily injury to another, or using or displaying a deadly weapon, while committing an assault. See Tenn. Code Ann. § 39-13-102(a). Aggravated robbery involves a defendant committing a robbery with a deadly weapon, or committing a robbery where the victim suffers serious bodily injury. See id. § 39-13-402(a). Thus, both crimes involve the defendant using a deadly weapon or causing serious bodily injury to the victim. "However, the fact that a prior conviction involves a similar crime for which the defendant is being tried does not automatically require its exclusion." Blevins, 968 S.W.2d at 893. Here, the State's proof of the Defendant's participation in the crimes charged was that he blocked the victims' cars; verbally accosted two of the victims while they were in their car; and told them to wait for his friend. There was no proof that the Defendant used or displayed a deadly weapon or caused serious bodily injury to any of the victims. Thus, while the statutory elements of the crimes charged and the impeaching offense were somewhat similar, there was very little similarity between the proof of the crimes charged and the elements of the impeaching offense. The unfair prejudicial effect of the impeaching conviction was therefore minimal.

With respect to the relevance of his aggravated assault conviction to the Defendant's credibility, this Court has previously held that "'felonies of a violent nature reflect on the moral character of a witness and . . . this evidence is not usually without probative value.'" State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996) (quoting State v. Daniel Strong, No. 88-82-III, 1989 WL 34942, at *2 (Tenn. Crim. App., Nashville, April 12, 1989)). We further note that, like the defendant did in Blevins, the Defendant here "made his credibility an important issue by denying any wrongdoing and asserting legitimate conduct." See 968 S.W.2d at 893 (holding that the defendant's prior convictions of burglary, attempted burglary, aggravated assault, larceny and robbery were admissible for impeachment purposes during the defendant's trial for automobile burglary). We find, therefore, that the trial court did not abuse its discretion in holding the Defendant's prior conviction for aggravated assault admissible for impeachment purposes. This issue is without merit.

The Defendant also complains about the extent of the State's cross-examination of him regarding this prior conviction. The prosecution's first question of the Defendant was whether he had been in a number of fights. When the Defendant responded in the affirmative, the prosecutor queried whether it would be "fair to say that you're a violent man?" When the Defendant explained that he could be made violent, the prosecutor referred to his prior aggravated assault conviction and asked how the victim had made him do that. The Defendant began to respond and defense counsel objected on the basis of improper character evidence. The trial court overruled the objection. The Defendant then explained that he had stabbed the prior victim in self-defense, and the prosecutor again asked what the victim had done to provoke the Defendant into stabbing him. The prosecutor also asked why the Defendant had pled guilty to the offense if he had acted in self-defense. The Defendant continued his explanation of the circumstances which led to his prior conviction, and defense counsel again objected and requested a mistrial. The trial court again overruled the objection and denied the motion for a mistrial. The State then moved on to other matters.

We agree with the Defendant that the State's cross-examination of him on these matters was improper. When the State is permitted to use a prior conviction for impeachment purposes, evidence of the prior conviction must be "limited to the fact of a former conviction and the crime that was committed." State v. Taylor, 993 S.W.2d 33, 34 (Tenn. 1999); see also Blevins, 968 S.W.2d at 894 (finding that "to the extent that the [prosecutor's] question [about the defendant's prior conviction] was for the purpose of eliciting underlying facts of the former convictions, it was improper.") The prosecutor went far beyond these limits when he asked the Defendant what the victim had done to provoke him into the assault. Moreover, the Defendant had already testified during direct examination about his prior aggravated assault conviction. The trial court erred in allowing the State to elicit the underlying facts of the offense.

The prosecutor's cross-examination contravened our rules of evidence in another manner as well. Clearly, the prosecutor was attempting to use the Defendant's prior conviction -- and the facts underlying that conviction -- not to impeach the Defendant's credibility, but to prove that he was a violent man. That is, the State was using the Defendant's prior bad conduct as character evidence. "Character evidence is generally inadmissible to show conformity with a certain trait on a particular

occasion." State v. West, 844 S.W.2d 144, 149 (Tenn. 1992); Tenn. R. Evid. 404(a). When a criminal defendant offers evidence of a pertinent character trait, the prosecution may offer evidence to the contrary in order to rebut the defendant's proof. Tenn. R. Evid. 404(a)(1). The Defendant offered no such proof in this case during his direct testimony. Accordingly, the trial court erred in allowing the State to offer proof that the Defendant was a violent man when he had not earlier testified that he was not. See West, 844 S.W.2d at 149 ("The prosecution in a criminal case is not permitted to open the door to questions of an accused's propensity for violence or peacefulness under the pretense of gathering ammunition for a credibility attack.")

Proof of a defendant's prior bad act may be admissible for purposes other than to show that he or she acted in conformity with a character trait. See Tenn. R. Evid. 404(b). "For example, when a prior bad act reveals a defendant's motive, shows a common scheme or plan, or rebuts a defendant's theory that the charged offense was an accident or mistake, the trial court may admit evidence of the prior bad act." West, 844 S.W.2d at 149. However, before doing so, the trial court must (upon request) hold a hearing out of the jury's presence, determine the material issue for which the evidence is being offered, and weigh the probative value of the evidence against possible unfair prejudice to the defendant. Tenn. R. Evid. 404(b). The State made no argument at trial that proof of the Defendant's prior actions leading to his aggravated assault conviction were offered for anything other than to demonstrate his violent character, nor does the State argue on appeal that the evidence was admissible in support of another material issue. The trial court conducted no hearing to determine the admissibility of this evidence, and simply overruled the Defendant's objections. In this the trial court erred.

However, while the proof was improper, we must conclude that its admission was harmless. As set forth above, the State's proof in this case was not that the Defendant physically assaulted the victims or threatened them with a deadly weapon. Rather, the State's case proved that the Defendant assisted Smithson in robbing and attempting to rob these men by blocking their vehicles with the Bronco; telling two of the men to wait for Smithson; and then taking a portion of the robbery proceeds from Smithson. The state offered no proof that the Defendant ever held a knife on any of the victims or physically assaulted them. In the context of the proof in this case, the Defendant's prior violent conduct was, in fact, irrelevant to prove that he had participated in the crimes on trial. Because the admission of this evidence does not affirmatively appear to have affected the outcome of the trial, we must deem it harmless error. See Tenn. R. Crim. P. 52(a). This issue is therefore without merit.

## ADMISSIBILITY OF PHOTOGRAPHS

Prior to the Defendant testifying, defense counsel attempted to introduce into evidence several photographs of the crime scene taken some time after the offenses were committed. The photographs purported to illustrate the positions of the victims' cars on Perkins Road, as well as views from the Carter's Creek Intersections with Perkins and Thompson's Station. All of the photographs were taken during daylight. The State objected on the grounds that the photographs had not been previously disclosed and that they were not relevant. The trial court sustained the State's objection. The Defendant now complains that the trial court's ruling was erroneous.

Under our rules of criminal procedure,

> [i]f the defendant requests disclosure under subdivision (a)(1)(C) or (D) of this rule, upon compliance with such request by the state, the defendant, on request of the state, shall permit the state to inspect and copy or photograph books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial.

Tenn. R. Crim. P. 16(b)(1)(A). The record before us in this case does not contain a request for disclosure by the Defendant, nor a reciprocal request by the State. The record does not, therefore, support the State's position that it was entitled to review the photographs prior to trial.

However, even if the trial court erred in refusing to admit the photographs, we find the error to have been harmless. During its case in chief, the State introduced a diagram of the crime scene. The Defendant was able to use this diagram during his testimony and furthermore could have drawn his own diagram had he chosen to do so. The key issue at trial was whether the Defendant assisted Smithson in the robbery and attempted robberies. The specific positions of the victims' vehicles and the daylight views from the intersections had little, if any, impact on this key issue. The trial court's ruling does not affirmatively appear to have affected the result of the trial on the merits, see Tenn. R. Crim. P. 52(a), and this issue is therefore without merit.

### ADMISSIBILITY OF DEFENDANT'S SCHOOL RECORDS

The Defendant also sought to introduce as substantive evidence certain of his school records for the purpose of proving that he had a learning disability, that he had trouble hearing, and that he had trouble expressing himself verbally and in writing. The Defendant attempted to introduce these records through the special education coordinator for Williamson County middle and high schools, arguing that these records were admissible under the business records exception to the hearsay rule. See Tenn. R. Evid. 803(6).

That rule provides for the admissibility of:

> A memorandum, report, record, or data compilation in any form of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used on [sic] this paragraph includes every kind of business, institution, association, profession, occupation, and calling, whether or not conducted for profit.

-8-

Id. The purpose of this rule "is to facilitate the use of business records by eliminating the expense and inconvenience of calling numerous witnesses involved in the preparation and maintenance of the records." Alexander v. Inman, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995).

In order to be admitted under Rule 803(6), the proffered documents must meet the following five requirements:

1. The document must be made at or near the time of the event recorded;

2. The person providing the information in the document must have firsthand knowledge of the recorded events or facts;

3. The person providing the information in the document must be under a business duty to record or transmit the information;

4. The business involved must have a regular practice of making such documents; and

5. The manner in which the information was provided or the document was prepared must not indicate that the document lacks trustworthiness.

Alexander, 903 S.W.2d at 700. Additionally, the rule requires that the foundation for admission of the proffered documents be provided by the custodian or other qualified witness. Tenn. R. Evid. 803(6).

Our court of appeals has previously held that

> [t]he term "qualified witness" should be given a broad interpretation. To be considered qualified, a witness must be personally familiar with the business's record-keeping systems and must be able to explain the record-keeping procedures. The witness is not required to have personal knowledge of the facts recorded, to have been involved personally in the preparation of the records, or even to know who actually recorded the information.

Alexander, 903 S.W.2d at 700 (citations omitted).

The records, which were admitted for identification purposes only, consist of a single page document titled "Integrated Evaluation Report" that appears to be a summary of sorts, concluding that special education services are necessary. Attached to this report are numerous other assessments, some of which indicate who prepared them, and some of which do not. The Integrated Evaluation Report is signed by several school personnel, but not by all of the persons who prepared the individual reports. The proffered witness in this case, Carol Hindlmyer, testified during a jury-

out hearing that the Williamson County School Board was the actual custodian of the records at issue[1] and that the employees hired by the School Board were the Board's representatives. She therefore considered herself one of the custodians of these records. She further explained that the records were required to be kept by federal law; that they were accurate; and that they were required to be kept in a timely fashion. She admitted on cross-examination that it was not her duty to record or transmit the records and that she had no personal knowledge of the Defendant.

The trial court ruled the records inadmissible on the grounds that the witness was not the custodian of the records; that there were concerns about the authenticity of the records; and that the State could not cross-examine the witness about the records since she had no personal knowledge about the information contained in them.

We conclude that Hindlmyer was a qualified witness for the purpose of establishing the required foundation for the admission of the contested records. However, she failed to testify adequately about the record-keeping procedures and about the multiple persons involved in creating the records. For instance, she did not testify that the persons providing the information in the records had firsthand knowledge of the recorded facts or events and that each was under a business duty to record or transmit the information. Also, she did not explain the parts these persons played in evaluating the Defendant; the significance of their reports to the overall evaluation; or why the document titled "Integrated Evaluation Report" is signed by only some of the persons who created the underlying documents on which the report appears to be based. In short, the Defendant did not adequately establish the requisite foundation for the admission of these records.[2] The trial court did not err in refusing to admit them.

Moreover, any error was harmless. The Defendant's wife testified about the Defendant's hearing and speech impediments, and she explained that he had significant difficulty in expressing himself. Furthermore, because the Defendant testified, the jurors had the opportunity to judge for themselves the effect of the Defendant's impediments. This issue is without merit.

## ADMISSIBILITY OF POLICE REPORTS

Detective Hagan prepared three reports on three different dates about the verbal statement the Defendant gave him prior to the Defendant making his written statement. The reports each contain some different or additional information. Defense counsel cross-examined Hagan extensively about these inconsistencies and about the inconsistencies between Hagan's reports and the Defendant's written statement. Initially, the Defendant tried to introduce the reports into

---

[1] According to Hindlmyer's testimony, the records consisted of the latest evaluation performed on the Defendant, together with the original information which placed him in the special education program.

[2] Hindlmyer's responses to the questions put to her were adequate. She was simply asked insufficient questions to satisfy the requirements of Rule 803(6).

evidence during his cross-examination of Hagan. The State objected on the basis of hearsay,[3] to which defense counsel offered no argument, and the trial court sustained the objection. Defense counsel tried again to admit the police reports during his case-in-chief. Defense counsel explained that he wanted to admit the records not for their truth but so that the jury would have the opportunity to evaluate their inconsistencies and Hagan's credibility. The trial court again ruled the records inadmissible.

The trial court did not err in either ruling. If offered for the truth of the matter contained within them, police reports are hearsay and not admissible as a public record. See Tenn. R. Evid. 803(8). In addition, they are not admissible as a business record when the declarant -- here, the Defendant --was under no business duty to make his statement. See State v. Allen, 692 S.W.2d 651, 653 (Tenn. Crim. App. 1985). If offered for impeachment purposes, on the other hand, they must qualify as prior statements inconsistent with the witness's trial testimony. See Tenn. R. Evid. 613(b). Here, the police reports were not inconsistent with Detective Hagan's trial testimony;[4] rather, they contained inconsistencies vis a vis each other, and they were inconsistent with the Defendant's written statement.[5] The Defendant offers us no authority for the admissibility of the police reports in this context. This issue is therefore waived, Tenn. Ct. Crim. App. R. 10(b), and, further, is without merit.

### DENIALS OF THE DEFENDANT'S MOTIONS FOR MISTRIAL
The Defendant next complains that the trial court erred by denying his motions for a mistrial. During the State's case-in-chief, Pilkinton testified that when he stopped at Jewel's market to report the robbery to the police he saw there, he also encountered some of the Defendant's family. He testified that they told him "they" were looking for the Defendant; that they had had a fight; and that there was a shotgun in the Bronco. It was unclear whether the "they" looking for the Defendant were the Defendant's family or the police. Defense counsel moved for a mistrial on the grounds that the witness reported that the police had been looking for the Defendant because of a fight. The trial court denied the Defendant's motion but instructed the State to ask no more questions along this line, and it instructed the jury to disregard this response.

The Defendant also requested a mistrial during his case-in-chief. During cross-examination the prosecutor asked the Defendant's wife what defense counsel had told her to say. Defense counsel did not object, and the witness replied that she had never rehearsed her testimony. The prosecutor

---

[3] The reports of public offices or agencies are generally admissible as an exception to the hearsay rule. See Tenn. R. Evid. 803(8). Police reports are specifically excluded from the exception, however. Id.

[4] Indeed, Detective Hagan agreed with and testified consistently with the information contained in the police reports. As such, the police reports were prior consistent statements. Prior consistent statements are generally inadmissible unless used for rehabilitative purposes. See, e.g., State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998); State v. Meeks, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993).

[5] We draw this conclusion from Detective Hagan's testimony at trial. The reports themselves are not included in the record.

-11-

then asked if defense counsel had told her how to say things or how to say something differently. Defense counsel objected and moved for a mistrial. The trial court overruled the motion. The State then moved on to different questions and the witness never answered the question to which defense counsel objected.

"The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict." State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). Whether to grant a mistrial is a decision within the trial court's discretion which will not be overturned absent an abuse of that discretion. Id.

The trial court's responses to the Defendant's motions for mistrial were correct. The jury was instructed to disregard Pilkinton's testimony, and the State did not pursue the matter. While the testimony was arguably prejudicial, it was not so to the extent of requiring a mistrial. With respect to the State's questions of the Defendant's wife, they were intended to impeach her credibility and were effectively denied. The prosecutor abandoned this line of questioning upon the Defendant's objection, and we see no damage precluding an impartial verdict, nor any manifest necessity requiring a new trial. The trial court's rulings were not erroneous, and this issue is without merit.

## CUMULATIVE ERROR

Finally, the Defendant contends that the cumulative effect of the errors committed during his trial operated to deprive him of a fair trial. While we agree with the Defendant that his trial did contain errors, we disagree that they were so significant, either singly or collectively, as to have deprived him of a fair trial. This issue is without merit.

The judgment of the trial court is affirmed.

DAVID H. WELLES, JUDGE

-12-