639 So.2d 329 (1994)
FAWER, BRIAN, HARDY & ZATZKIS, Etc.
v.
Dr. Randolph HOWES, et al.
No. 93-CA-2076.
Court of Appeal of Louisiana, Fourth Circuit.
June 15, 1994.
*330 John Holahan, New Orleans, for plaintiff.
Dwight Doskey, and David B. Bernstein, New Orleans, for defendants.
Before SCHOTT, C.J., and CIACCIO and ARMSTRONG, JJ.
ARMSTRONG, Judge.
This is a suit for collection of unpaid legal fees. After trial, the trial court rendered judgment in favor of the plaintiff and against each of the two defendants. We affirm.
The plaintiff is the law firm of Fawer, Brian, Hardy & Zatkis ("the law firm") and the defendants, two of its former clients, are Dr. Randolph Howes and Howes Broadcasting Corporation. Howes Broadcasting is, apparently, owned wholly or partially by defendant Dr. Howes. The law firm represented Dr. Howes with regard to six matters (two of them closely related) and represented Howes Broadcasting with regard to two matters. For simplicity, and because Dr. Howes appears to have acted on behalf of the Howes Broadcasting in that corporation's dealings with the law firm, we will refer to the defendants simply as "Dr. Howes".
The law firm opened a separate file for each of the eight matters for which services were performed. The law firm sent a billing statement to Dr. Howes each month as to each of the eight matters. Dr. Howes paid some of the amounts billed. However, the law firm alleges that Dr. Howes did not pay all of the amounts for which he was billed by the law firm. Dr. Howes admits that he did not make full payment. However, Dr. Howes makes three arguments on appeal why he should not have been cast in judgment for the outstanding amounts billed. First, he argues that the trial court erred in admitting into evidence the law firm's monthly billing statements because they were not sufficiently "trustworthy" to be admissible under the business record exception to the hearsay rule. Second, he argues that even if the monthly billing statements were properly admitted, the evidence was insufficient to prove the law firm's claim. Third, he argues that the trial court erred in rejecting his contention that the law firm committed malpractice in connection with one of the matters.

I.
As to the first issue, we find that the trial court did not err in finding the monthly billing statements to be admissible. Article 803 of the Code of Evidence provides, in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * * * * *
In a civil case, a memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if made and kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make and to keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

La.Code Evid. art. 803(6) (in part) (emphasis added). "The custodian or other witness who testifies to the foundational requirements, however, need not have personal knowledge of the fact recorded." La.Code Evid. art. 803, comment (e) to exception (6) (in part). See Cole Oil and Tire Co. v. Davis, 567 So.2d 122, 128-29 (La.App. 2d Cir.1990) (detailed analysis of operation of Article 803(6) in the context of suit for unpaid invoices).
There was extensive testimony by the law firm as to how the monthly billing statements were compiled and reviewed for accuracy. First, Mr. Ashton Hardy, who was one of the law firm's partners, and the partner with overall responsibility for the law firm's professional relationship with Dr. Howes, testified:
Yes, each month since this was my client, each month I personally reviewed every review statement. Each month after reviewing the review statement where *331 editorializing was necessary, moving of an improperly allocated time ticket to its proper file, a second review statement was sent by the bookkeeper to my office and I personally reviewed each one of those every month. After they were in final form they were returned to her and the bills were printed. Once the bills were printed those were sent to me and I reviewed each and every bill, each and every month before they were sent out to the client, and that procedure was followed in Dr. Howes' case.
The exhibits that are attached to the plaintiff's petition are an accumulation of each and every one of the review statements and each and every onefinal review statementsand each and every one of the final bills. These were made from the accounting copies that were kept as a permanent office record of the firm. Those copies were personally reviewed by me to be attached as the exhibits to the lawsuit which was personally reviewed by me and approved with the exhibits attached. I am thoroughly conversant and familiar with each and every document that is attached as a exhibit to the plaintiff's lawsuit and can attest to the fact that they were the ordinary business records of the law firm and that they were attached as exhibits to document billing.
No, thissee if I can explain the billing system. Each attorney writes an individual time ticket. Those are delivered daily to a computer processing person who inputs them into the computer. At the end of a month a review statement is submitted to the lawyer whose client is being billed. That review statement documents each of the time tickets that went in. That is then reviewed by the billing attorney, the attorney responsible for the client. That review statement will also tell us if a payment was made on the account during that month. When a bill is generated the bill will be an exactbasically an exact duplicate with some of the detailed internal information removed that goes to the client. The bill that goes to the client will detail precisely the amount of the payment and the credit and the reduction in the bill. So for each of those accounts as you go through them, if you return through them month by month you will see a reference to the payment and the exact date that the payment was received in the office.
Ms. Lynn Wasserman, another of the law firm's attorneys who worked on the representation of Dr. Howes, testified as follows:
No. I will tell you, however, Mr. Bernstein, that at the end of the month or the beginning of the month or whenever the billings were generated by the computer, that at least one attorney would thoroughly review the bill before it went out, and Mr. Hardy would review it also as the responsible attorney for this particular client.
Mr. Lanny Zatkis, another of the law firm's attorneys who worked on the representation of Dr. Howes, testified as follows:
Let me tell you, because I was not here for all of Mr. Hardy's testimony, I want to tell you what the procedure was. Mr. Hardy was what we call the responsible attorney. He brought the client to the firm. Lynn Wasserman had the primary responsibility of day-to-day contact. She reviewed the billing memorandum which was the pre-bill before I did. She made certain that there was nothing incorrect about his bill and that I reviewed it line by line after she reviewed it, and then I gave it to Mr. Hardy who was supposed to review it line by line and send it to the client.
Michael Mayhall, another of the law firm's attorneys who worked on the representation of Dr. Howes, testified as follows:
Q Tell us what you would know about the compilation of the bills of the firm, how they got presented, who corrected them if any, so forth?
A As pertains to Dr. Howes it would be the same for all of Ashton Hardy's clients. This was firm-wide clients, every partner who brought in a client had responsibility for assuring that that person's bill was sent out correctly. The file that I worked on for Ashton, as there were many because I was the business *332 and tax attorney in the firm, he gave me most of the business and tax work. I would do a time ticket on a daily basis which would show what I had done by each day and the hours I worked. At the end of the month the bills would be compilated into a billing memo we call them, and I would review the billing memo and give it to Ashton who would review the billing memo. Either Ashton would bring me the billing memos for his clients, which of all the clients I had worked on Ashton may have, say 150 clients, and he would bring me those clients' billing memos that I had worked on, asked me to review the charges and make sure they were correct. I would review the charges and give those back to Ashton. There were many times when Ashton would come back to me with questions about particular charges, why is this item this much, what did you do on this particular day, what is the charge for this? So, each month I would review them, then Ashton would review them, and then they would be sent out to the client, and they were reviewed for both a substantive point as to what was actually billed and the amount of hours billed. They were also reviewed to make sure the cost was properly assigned to each file.
Dr. Howes concedes that Mr. Ashton Hardy, the first witness quoted above, is a "qualified" witness within the meaning of La.Code Evid. art. 803(6) but argues that the billing statements are not "trustworthy" within the meaning of the La.Code Evid. art. 803(6). However, not only Mr. Hardy's testimony, but also the testimony of several other attorneys of the law firm, quoted above, gave the trial court ample grounds to consider the billing statements "trustworthy" within the meaning of La.Code Evid. art. 803(6). Under the procedure described by the above quoted witnesses, the billing statements reflect the work done on each file each month and the charges for that work for each file each month as well as credits for payments received and the amount of any outstanding balances due as to each file. The billing statements themselves, which are plaintiff's exhibit 1 in globo, on their face appear to be exactly as they should in light of the above-quoted witnesses' testimony. Furthermore, no irregularity as to the time and task of record keeping or the compilation of the billing statements was evidenced either on direct or cross examination. We cannot say that the trial court erred in admitting the billing statements into evidence.

II.
Dr. Howes' second argument is that, even if admissible, the billing statements are not sufficient to prove that the legal services were rendered or to establish the amounts owed. Of course, just because particular evidence is admissible does not mean that it will be persuasive to the finder of fact or that it is sufficient to support some particular factual finding. But, in the present case it is obvious that the trial court did find the billing statements persuasive. The issues of the work done and the amounts owed are ones of fact and we may not set aside the trial court's factual determinations unless they are "clearly wrong" or "manifestly erroneous." Stobart v. State, Through Dept. of Transportation, 617 So.2d 880 (La.1993). We do not believe the trial court committed "manifest error" or was "clearly wrong" in view of the record below. There was testimony by the law firm's attorneys who worked on the representation of Dr. Howes as to the work they did, how that work was billed and to the effect that the work done was authorized by Dr. Howes. Obviously, the trial court found that testimony of the law firm's attorneys to be credible and, in light of the record as a whole, the trial court's credibility determination was perfectly reasonable. We have examined the billing statements and note that they give reasonably specific descriptions of the work done on each file each month and the specific dates on which specific work was done. It was perfectly reasonable for the trial court to rely on those billing statements. Moreover, with the exception of Dr. Howe's specific complaints about one matter, which is discussed below in connection with Dr. Howes' third argument, no evidence was offered to rebut either the testimony of the law firm's lawyers or the "billing" statements. In sum, the trial court's factual determinations *333 as to the legal work done and the amounts owed for that work are amply supported by the record and must be accepted on appeal.
Finally, we note that a claim for attorneys' fees is subject to judicial review to insure that no "clearly excessive" attorney's fee is awarded. Drury v. Fawer, 590 So.2d 808-811 (La.App. 4th Cir.1991), writ denied, 592 So.2d 1304 (La.1992); and Gibson v. Burns, 505 So.2d 66, 69 (La.App. 4th Cir. 1987).
We are of the further opinion, however, that review of purportedly excessive attorney fees should be tempered with judicial restraint. The courts should not be in the business of setting fees. Article 2000 authorizes a valid contract for attorney fees and the courts should not interfere with that contract unless there is a "clearly excessive fee" involved. The term "clearly excessive" used by the Court in Leenerts Farms [Inc. v. Rogers], [421 So.2d 216 (La.1982)] supra, was taken from the provisions of DR 2-106 of the Code of Professional Responsibility as they existed at that time. We interpret that term to mean so grossly out of proportion with the fees charged for similar services by other attorneys in the locale as to constitute an unquestionable abuse of the attorney's professional responsibilities to the public.
Gibson v. Burns, 505 So.2d at 69. Dr. Howes did not offer any expert testimony as to whether the attorneys' fees claimed by the law firm are "clearly excessive" and nothing in the record suggests that the claimed attorneys' fees are "clearly excessive" within the meaning of our Gibson v. Burns decision. The trial court evidently concluded, in light of the testimony of the law firm's attorneys, that the attorneys' fees claimed by the law firm were not "clearly excessive" and that conclusion of the trial court was reasonable in light of the record as a whole.

III
Dr. Howes' third argument is that the law firm committed malpractice as to one of the eight matters and that this damaged him and entitles him to a set-off against the amount he owes the law firm. At the outset of our own discussion of this argument, we note that in this case the issue of alleged malpractice is one of fact, subject to the "clearly wrong" or "manifest error" standard of review under the Supreme Court's Stobart decision. We also note that the law firm's attorneys testified with respect to this issue and vigorously defended their work and that Dr. Howes presented no expert testimony, or any testimony at all except his own, as to this issue. Instead, Dr. Howes relies upon the argument that in a case of "obvious malpractice" no expert testimony is necessary. However, as will be seen from the immediately following discussion, the alleged malpractice in this case does not involve any "obvious" issues.
Dr. Howes applied for and received a patent on a medical device described as the "Howes Venous Catheter Device" while he was married to Janice Kinchen Howes. Dr. Howes and Mrs. Howes later divorced. The patent became an object of contention and there was litigation as to whether the patent was community property or Dr. Howes' separate property. In particular, there was an issue of whether Dr. Howes engaged in a sham "sale" to try to make the patent separate property. Dr. Howes lost and the patent was determined to be community property. Howes v. Howes, 436 So.2d 689 (La.App. 4th Cir.), writ denied, 441 So.2d 216 (La. 1983).
Dr. Howes attempted to relitigate the community property status of the patent at a later time. His arguments in the second round of litigation apparently included one that the patented device was developed while he and Mrs. Howes were domiciled in a noncommunity property state, and one that the patent had been re-issued after the termination of his community property regime with Mrs. Howes. These arguments were held to be barred by res judicata. Howes v. Howes, 518 So.2d 1147 (La.App. 4th Cir. 1987), writ denied 523 So.2d 232 (La.1988). The law firm did not represent Dr. Howes in the two above described rounds of litigation between Mr. and Mrs. Howes.
The law firm became involved in Dr. Howes' dispute with Mrs. Howes over the patent in a attempt to have the "patent re-issue" argument heard in federal courti.e., *334 in a third round of litigation over the patent between Dr. Howes and his ex-wife. In reciting the facts relative to the law firm's work for Dr. Howes, we note that neither Dr. Howes' patent attorney, a Mr. Smith from Washington, D.C., nor his patent litigation counsel, the firm of Fish and Neave in New York, testified at trial. Also, the law firm's attorneys did not testify that they were patent attorneys and Dr. Howes did not testify and does not argue that they held themselves out to be patent attorneys; rather, it is clear that the law firm's attorneys practiced family and community property law (among other things). Thus, as to this alleged malpractice in the handling of a community property dispute involving a patent, we do not have the benefit of a record with any testimony of any patent attorney, whether as an expert witness or otherwise. This is of some significance because, as will be discussed below, the law firm's alleged acts of malpractice allegedly had an adverse impact on a patent infringement lawsuit in Pennsylvania being prosecuted for Dr. Howes by the Fish and Neave firm. Proving this theory of liability without the benefit of any expert testimony would be quite difficult if it is possible at all.
The law firm filed a complaint in federal court on behalf of Dr. Howes and against his ex-wife. The complaint stated, in pertinent part:
V.
Plaintiff and Defendant Janice Kinchen were married on August 31, 1964. They were subsequently divorced by Judgment of the Civil District Court For the Parish of Orleans, State of Louisiana. The community of acquets and gains existing between them was terminated upon their divorce, retroactive to the date the petition for divorce was filed, October 26, 1978.
VI.
During the marriage, Dr. Howes invented a multi-lumened venous catheter device. The U.S. Patent Office issued the original patent on the device, Patent Number 4072146, on February 7, 1978.
VII.
On April 20, 1982, Janice Kinchen filed a Rule To Traverse in Civil District Court for the Parish of Orleans, asserting that the patent was a community asset and that she was the owner of one-half undivided interest therein.
VIII.
By Judgment of the Louisiana Fourth Circuit Court of Appeals in Howes v. Howes, 436 So.2d 689 (La.App. 4th Cir. 1983), writs denied, 441 So.2d 216, the original patent (No. 4072146) was deemed to be a community asset, subject to partition upon the parties' divorce. The Fourth Circuit's holding was based on the fact that both the invention AND the patent were acquired during the parties' marriage, and were therefore presumptively "community".
IX.
On January 17, 1983, Patent No. 4072146 was surrendered to the U.S. Patent Office. At the same time, a reissue application, Serial No. 444,710 was filed. Patent reissue fees were paid on November 9, 1984, and the formal reissue patent is expected in early 1985.
X.
All work done on the reissue patent was performed subsequent to the community's termination. Furthermore, the reissue patent itself will be granted more than five years after the parties' divorce.
XI.
Of the ten claims comprising the original patent, only one, Claim Seven, was continued to the reissue patent. The original Claims One through Six and Eight through Ten were surrendered to the U.S. Patent Office.
XII.
None of the claims contained in the original application, including Claim Seven, *335 were sufficient to support license agreements, or to prevent infringement, because of certain prior art not considered by the U.S. Patent Office in making the initial determination. The discovery of the prior art necessitated a reissue application almost wholly different from the original patent claims.
* * * * * *
XVIII.
Under federal law, an invalid patent does not vest property rights in the patentee. Therefore, the "asset", for purposes of determining ownership must a valid patent.
XIX.
In this case, the property rights conferred by the original patent issued during the marriage were either worthless or nonexistent. Claim Seven, the only claim continued to the reissue patent, was insufficient in and of itself to prevent infringement or to confer property rights of any value.
XX.
When the reissue patent is granted, Plaintiff will, for the first time, acquire vested enforceable property rights based on the four new claims of the reissue application. Therefore, all property rights of any worth will be acquired in their entirety subsequent to the community's termination.
XXI.
Plaintiff is therefore entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 stating that Plaintiff is the full and sole owner of any and all property rights that will be conferred by the reissue patent, as well as all royalty payments resulting therefrom, to the exclusion of Defendants, Janice Kinchen and Baham and Anderson, Attorneys At Law.
It is apparent that the thrust of this complaint is that it is the re-issue patent, which would post-date the termination of the community property regime, and not the original patent (which was community property), which is of practical benefit and economic worth. In the face of the apparent legal connection between the original patent and the re-issued patent, and in the face of the obvious fact that the original patent and re-issued patent both relate to the same catheter device, the complaint sought to have the determination of whether the re-issue patent was community or separate property made independently of the original patent. In short, in order to have the re-issue patent declared separate property, the complaint sought to break the link between the re-issue patent and the original patent. The theory adopted in the attempt to break the link was that the re-issue patent was valuable and that the original patent was not.
At the time the law firm filed the complaint, Dr. Howes had a patent infringement suit pending in Pennsylvania. Apparently, this Pennsylvania suit was for the opposing party's infringement of the original patent. In any event, Dr. Howes' patent litigation counsel, Fish and Neave, became concerned that the allegations of the complaint filed by the law firm would prejudice their prosecution of Dr. Howes' patent infringement suit in Pennsylvania. In particular, the complaint's characterization of the original patent as "worthless" caused serious concern.
Thus, Dr. Howe directed the law firm to dismiss the complaint and it was dismissed without prejudice. However, according to Dr. Howes, the complaint did become an issue at the trial of his patent infringement suit in Pennsylvania. Dr. Howes won that suit, but despite his lack of legal expertise in general or expertise as to patent law in particular, he testified that the damages awarded by the Pennsylvania jury were less than they would have been but for the issue of the complaint filed by the law firm.
The law firm's response to Dr. Howes' criticism of the filing of the complaint is two-fold. First, the law firm argues that Dr. Howes reviewed the complaint and even participated in its preparation and insisted that it be filed despite the law firms advice against doing so. (The law firm argues that Dr. Howes did this because of his intense *336 animosity towards his ex-wife.) Second, the law firm argues that Dr. Howes' patent counsel, Mr. Smith, was consulted in connection with the preparation of the complaint, that the law firm made clear to Mr. Smith what would have to be alleged in the complaint, and that the law firm was not told that the filing of the complaint would cause any problems with other litigation. The law firm supported these arguments with the testimony of its attorneys, and the testimony of Dr. Howes' accountant, who had attended a meeting of Dr. Howes with the law firm to discuss the complaint prior to its filing. Dr. Howes' testimony contradicted the law firm's testimony in some respects. The trial court accepted the law firm's testimony as to the facts and, thus, rejected Dr. Howes' allegations of malpractice.
Lynn Wasserman testified that the complaint was filed on Dr. Howes' "specific instruction" and based that testimony on discussions among her, the other law firm attorneys, Dr. Howes and Mr. Smith. She sent Dr. Howes a letter with the complaint prior to its filing to document his specific approval. She also testified as to the discussions she had with Dr. Howes' patent attorney, Mr. Smith, during the preparation of the complaint.
We were attempting on behalf of Dr. Howes to get some sort of declaration from some court that this reissued patent was actually new property post maritally. Frankly, you know, we had some philosophical problems with that, but we were attempting to the best of our ability to make this into new property.
Well, after great consultation with the patent attorney in Washington, D.C., we found this complaint. The patent attorney argued and explained to us that it was necessary to keep the same claims in, but in order to make it separate property or to fashion an argument that it was separate property what we would have to say is that, yes, we have got the old claims in there but they were only kept in there for purposes of continuity and that the real guts, if you will, the real basis of the patent now are the new claims, and as I recall Mr. Smith instructed us greatly on those issues and insisted that this was the way it had to be said because it was important that we not say that this is a completely different patent for patent purposes. We had to say they were keeping in the old claims merely for continuity but that the guts of the reissued patent were the new claims. That is exactly what we put in the federal complaint.
Our goal, according to Dr. Howes' instructions to us, was to make this reissued patent separate property. In fact, he told me that, and this was said in the presence of Mr. Mayhall, as I recall, that he would prefer for the patentthe whole patent thing to just be thrown out the window and him not to make any money at all rather than to see half of it go to his wife. There was an enormous amount of animosity between Dr. Howes and his former wife.
Ms. Wasserman's testimony was corroborated by Lanny Latkis, another of the firm's attorneys, who also worked on the attempt to relitigate the "patent re-issue" argument by the filing of the complaint. Mr. Dale Wood, Jr., who was Dr. Howes' accountant at the time, and who attended a meeting between Dr. Howes and the law firm's attorneys at which the complaint was discussed, also corroborated Ms. Wasserman's testimony that Dr. Howes was "adamant" that the complaint be filed despite the advice to the contrary of the law firm's attorneys.
The trial court's acceptance of the law firm's factual position is not "manifest error" or "clearly wrong" under the Supreme Court's Stobart standard and in light of the record. The trial court found the law firm prepared and filed the complaint in accordance with Dr. Howes' instructions and in consultation with Dr. Howes' patent counsel. When Dr. Howes patent litigation counsel, Fish and Neave, became concerned, Dr. Howes changed his mind and directed the law firm to dismiss the complaint. The trial court did not err in rejecting Dr. Howes' claim of malpractice.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.