BROWN, Chief Judge.
| plaintiffs, Tamara Hubbard, Brandee Noid, and Latonia Hubbard, are the surviving daughters of Brenda Faye Noid, who died on February 14, 2009. Plaintiffs hired an attorney, Mason Oswalt, in May 2009 to pursue a medical malpractice/wrongful death claim arising out of their mother’s death. On February 8, 2010, Oswalt filed a complaint with the Division of Administration on plaintiffs’ behalf, naming three separate defendants: Dr. Robert Kerry, Dr. Louis Crook, and St. Francis Medical Center.
By letter dated February 18, 2010, the Patient’s Compensation Fund (“PCF”) informed Oswalt that each of the medical malpractice defendants was a qualified health care provider and that, by statute, he had 45 days, or by April 5, 2010, to remit a filing fee of $300. Payment was not timely sent, however, and by letter dated April 20, 2010, the PCF notified Oswalt that his clients’ claim was not going to be considered because payment had not been made within the 45-day period. Os-walt sent a $300 check to the PCF on May 6, 2010, requesting that plaintiffs’ complaint be reinstated because his failure to pay the filing fee timely was based on a clerical error. This request was denied by the PCF via letter dated May 12, 2010.
On June 16, 2010, Oswalt sent plaintiffs a letter informing them of a possible legal malpractice claim they might have against him as a result of the loss of their medical malpractice claim based upon his failure to timely remit the filing fee to the PCF, and plaintiffs retained their present attorneys, who filed the instant legal malpractice action against defendant, Mason Oswalt. In their petition, plaintiffs alleged that Os-walt’s failure to timely remit the filing fee fell below the applicable professional standards and ^constituted legal malpractice that deprived them of their opportunity to seek compensation from the medical malpractice defendants. After a general denial was filed by Oswalt, plaintiffs filed a motion for summary judgment on the issue of liability, which was unopposed by their former attorney. On February 24, 2012, the trial court signed a judgment granting plaintiffs’ motion for summary judgment, finding that Oswalt’s actions constituted legal malpractice. The sole issue remaining was plaintiffs’ entitlement to damages based upon a loss caused by Oswalt’s negligence. See White v. Golden, 43,076 (La.App.2d Cir.04/30/08), 982 So.2d 234.
A “trial within a trial” of the underlying medical malpractice claim plaintiffs previously had was held, with attorney Oswalt’s legal malpractice defense counsel stepping into the shoes of the medical malpractice defendants Oswalt would have sued on behalf of plaintiffs had the claim not prescribed. Medical experts for both sides testified, including one of the physicians named in the initial claim, as did the indi *763 vidual plaintiffs, and their mother’s voluminous medical records were introduced into evidence. The trial court found that defendant, Mason Oswalt, met his burden of proving by a preponderance of the evidence that plaintiffs could not have succeeded on their original medical malpractice/wrongful death claim and on August 29, 2014, signed a judgment in favor of defendant, dismissing plaintiffs’ claim. It is from this adverse judgment that plaintiffs have appealed.
| ^Discussion
To establish a claim for legal malpractice, plaintiffs must prove the existence of an attorney-client relationship; negligent representation by the attorney; and loss caused by that negligence. Costello v. Hardy, 08-1146 (La.01/21/04), 864 So.2d 129; White, supra, Jenkins v. Washington & Wells, L.L.C., 46,825 (La.App.2d Cir.01/25/12), 86 So.3d 666, writ denied, 12-0427 (La.04/09/12), 85 So.3d 705. Absence of proof of one of these elements is fatal to plaintiffs’ claim. Id.
A critical element in any tort claim is proving factual cause. In the instant case, the only issue is whether plaintiffs sustained a loss as a result of their attorney’s negligence, the other two elements having been established via summary judgment. After years of following the “case within a case” requirement, the Louisiana Supreme Court, in Jenkins v. St. Paul Fire & Marine Insurance Co., 422 So.2d 1109 (La.1982), modified this theory for legal malpractice cases. As stated by the court in Jenkins, 422 So.2d at 1110:
Once the client has proved that his former attorney accepted employment and failed to assert the claim timely, then the client has established a prima facie ease that the attorney’s negligence caused him some loss, since it is unlikely the attorney would have agreed to handle a claim completely devoid of merit. In such a situation, a rule which requires the client to prove the amount of damages by trying the “case within a case” simply imposes too great a standard of certainty of proof. Rather, the more logical approach is to impose on the negligent attorney, at this point in the trial, the burden of going forward with evidence to overcome the client’s prima facie case by proving that the client could not have succeeded on the original claim, and the causation and damage questions are then left up to the jury to decide.
14The court in Jenkins held that a plaintiff proves his prima facie case upon showing that the former attorney is negligent; in Jenkins, as in the instant case, the attorney’s negligence consisted of the failure to timely file his client’s action. The burden then shifts to the former attorney to overcome a plaintiffs prima facie case by proving that the plaintiff could not have won the original claim.
In a medical malpractice action, the plaintiff must prove by a preponderance of the evidence the applicable standard of care, a violation of that standard of care, and a causal connection between the violation of the standard of care and the claimed injuries. Johnson v. Morehouse General Hospital, 10-0387 (La.05/10/11), 63 So.3d 87; Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228. Resolution of each of these inquiries is a determination of fact which should not be overturned on appeal absent manifest error. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Harper v. Minor, 46,871 (La.App.2d Cir.02/01/12), 86 So.3d 690, writs denied, 12-0524, 12-0528 (La.04/27/12), 86 So.2d 629, 632. Thus, in a legal malpractice case the negligent attorney must prove by a preponderance of *764 the evidence that the plaintiff could not have won the medical malpractice claim.[1]
|fiThe Louisiana Supreme Court recently re-emphasized the principles involved in the appellate standard of review of findings of fact in Snider v. Louisiana Medical Mutual Insurance Co., 2014-1964, 169 So.3d 319, 323, 2015 WL 2082480, at *3 (La. May 5, 2015):
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). This test dictates that a reviewing court must do more than simply review the record for some evidence that may controvert the trial court ruling. Rather, it requires a review of the entire record to determine whether manifest error has occurred. Thus, the issue before the court is not whether the trier of fact was right or wrong, but whether the fact-finder’s conclusion was a reasonable one. Clay v. Our Lady of Lourdes Regional Medical Center, 11-1797 (La.05/08/12), 93 So.3d 536, 543. The appellate court must not reweigh the evidence or substitute its own factual findings because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.04/03/02), 816 So.2d 270, 278-9. Where the fact-finder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. Bellard v. American Central Ins. Co., 07-1335 (La.04/18/08), 980 So.2d 654, 672.
The trial court’s factual determinations which form the basis of its conclusion that defendant met its burden of proving that plaintiffs would not have been successful in their original claim are subject to the manifest error/clearly wrong standard of review. Cree Oil Co. v. Home Insurance Co., 94-1219 (La.App. 3d Cir.03/08/95), 653 So.2d 620, writ denied, 95-1554 (La.09/29/95), 660 So.2d 875; Fawer, Brian, Hardy & Zatzkis v. Howes, 92-2076 (La.App. 4th Cir.06/15/94), 639 So.2d 329. | fiAs directed by the supreme court in Jenkins, 422 So.2d at 1113, we therefore will review the evidence of this trial within a trial in the light most favorable to the prevailing party in the trial court, which in this case was defendant, keeping in mind that defendant had the burden of producing sufficient proof to overcome plaintiffs’ prima facie case by proving that they could not have succeeded on their underlying claim. See Lowe v. Continental Ins. Co., 437 So.2d 925 (La.App. 2d Cir.1983).
*765 Mrs. Brenda Noid presented to the Emergency Department at St. Francis Medical Center on the afternoon of February 9, 2009. She reported complaints of shortness of breath, neck and shoulder pain, numbness around her mouth, and tightness in her abdomen. An elevated heart rate and respiration was observed. Dr. Robert Kerry was on duty in the ER at that time. He ordered an EKG, a chest x-ray, and several laboratory studies, including a CBC, blood chemistries, and arterial blood gases. Dr. Louis Crook took over Mrs. Noid’s care from Dr. Kerry around 7:00 p.m. on February 9. Dr. Crook reviewed her chest x-ray and blood gases as well as the results of the blood chemistries and noted that Mrs. Noid had been administered 30 mg of Lasix intravenously. Mrs. Noid was discharged at 8:40 p.m. and instructed to follow up with her treating cardiologist, Dr. Islam.
Mrs. Noid returned to the ER at St. Francis in the late afternoon of February 11, 2009, complaining of shortness of breath, chest, arm and neck pain, an elevated heart rate and elevated respiration. Dr. Kerry initially treated her. Later that evening, Mrs. Noid was evaluated by Dr. Sunil Prem, |7a critical care specialist, who admitted her due to a progressive deterioration in her overall condition. Mrs. Noid passed away on the morning of February 14, 2009.
Plaintiffs’ general malpractice allegation was that the treatment rendered to Mrs. Noid on February 9, 2009, by Drs. Kerry and Crook and the staff of St. Francis Medical Center fell below the applicable standards of care and was a substantial factor in causing her death. Specifically included were claims of negligence in: (1) ordering but not performing or following up on the CBC; (2) charting/recordkeep-ing by the nursing staff and Drs. Kerry and Crook; and (3) diagnosis and treatment/discharge of Mrs. Noid. The trial court issued written reasons discussing its specific factual findings. We will analyze each one in light of our review of the entirety of the record.
The trial court first rejected plaintiffs’ allegation that the nursing staff failed to draw blood for the CBC, noting testimony from Dr. Crook which established that several vials of blood are drawn at one time then submitted for various tests that are ordered. The fact that Dr. Crook reviewed and received the results of Mrs. Noid’s blood gases necessarily means that her blood was drawn. More critically, the inquiry was why the CBC test was not performed and its results reported to Dr. Kerry or Dr. Crook. Both of plaintiffs experts, Drs. Walter Simmons and Sheldon Kottle, as well as Dr. Crook, opined that failure to perform and follow up on the CBC as well as the level of charting was below the applicable standard of care. The record supports the trial court’s finding that the hospital staff was negligent for |sfailing to carry out the order for the CBC and in failing to document the reasons why.
The trial court next addressed plaintiffs’ contention that had the CBC been performed as ordered on February 9, 2009, more likely than not it would have shown sufficient abnormalities so that Mrs. Noid would have been hospitalized on that date rather than discharged. Plaintiffs further asserted that this hospitalization would have resulted in earlier recognition of an underlying sepsis, with treatment being provided at an earlier and more effective point in time.
According to plaintiffs’ experts, Drs. Simmons and Kottle, the CBC with differential would have revealed signs of an infection before it progressed to sepsis and septicemia, which plaintiffs contend was the cause of Mrs. Noid’s death. Drs. Sim *766 mons and Kottle found it significant that the initial death summary prepared by Dr. Prem, the critical care specialist who treated Mrs. Noid during her hospitalization on February 11-14, 2009, included in its multiple possible causes of death sepsis and septicemia. Dr. Kottle, accepted as an expert in internal medicine and nephrolo-gy, opined that without the information that could have been obtained from the CBC evaluated in the context of the other laboratory data, Drs. Kerry and Crook failed to recognize the significance of Mrs. Noid’s elevated anion gap as an indicator of an underlying infection in a patient such as Mrs. Noid with her presentation on February 9, 2009, and considering the significant co-morbid conditions that limited her body’s ability to fight such an infection. According to Dr. Kottle, with a CBC, the diagnostic possibilities could have | Jed to a consideration of sepsis, which he opined Mrs. Noid had. Dr. Kot-tle stated that appropriate antibiotic therapy instituted early significantly reduces the mortality and the physicians’ delay in promptly diagnosing and admitting Mrs. Noid resulted in a lost chance of survival. Dr. Simmons, plaintiffs’ emergency medicine expert, concurred with Dr. Kottle’s findings and opinion that substandard medical and nursing care on the part of Drs. Kerry and Crook and the St. Francis staff resulted in the death of Mrs. Noid.
Dr. Scott Irby, a specialist in internal medicine and pulmonary and sleep medicine, stated that he began seeing Mrs. Noid in 1999 and last treated her in July 2008, approximately eight months before her death. According to Dr. Irby, Mrs. Noid suffered from a condition known as sarcoidosis, which is a systemic disease that causes scarring in the lungs, liver and other organs. Mrs. Noid also had an enlarged heart, elevated blood pressure and pulmonary hypertension. When Dr. Irby last saw Mrs. Noid in July 2008, her sar-coidosis was “burned out,” or inactive. However, as her medical records showed, her ACE level during her hospitalization of February 11-14, 2009, was the highest it had ever been, and this was an indication that her sarcoidosis had been reactivated. Dr. Irby disagreed with Dr. Kottle’s opinion that Mrs. Noid had metabolic acidosis on February 9, 2009. Instead, Dr. Irby stated that Mrs. Noid had respiratory al-kalosis, which was caused by her reaction to the fluid on her lungs, which caused her to breathe very quickly. Dr. Irby agreed with Dr. Crook’s discharge diagnosis of hyperventilation syndrome. Dr. Irby noted that Mrs. Noid was treated with 30 mg of Lasix via IV for presumptive heart failure, something |10that she had been diagnosed with and treated for previously. Dr. Irby testified that Mrs. Noid had been to the emergency room multiple times for congestive heart failure and too much fluid volume. He reiterated that she had episodes of congestive failure many times for 12-14 years.
Regarding the lactic acidosis that Mrs. Noid experienced during her second admission to St. Francis, Dr. Irby stated that this was due to the lack of blood flow to her organs, which started to die and give off lactic acid. When asked whether the ER physicians had properly considered the chest x-ray taken on February 9, 2009, Dr. Irby testified that, “They said she had cardiomegaly, enlarged heart, and they gave her Lasix for congestive heart failure. And that’s what the x-ray showed.” When questioned about the physicians’ failure to follow up on the CBC on February 9, Dr. Irby acknowledged that whether a doctor should follow up with the tests he ordered depends upon whether the tests are still pertinent in light of other information. Dr. Crook’s testimony was that the blood gases on February 9 showed that Mrs. Noid was not anemic, which was Dr. *767 Crook’s concern, and that is why he did not request another blood draw for a CBC.
Dr. Irby found it significant that two days later when Mrs. Noid was admitted, her initial CBC showed no heightened white blood cell count, which meant that there was no indication whatsoever that Mrs. Noid had been septic on February 9. Furthermore, she had presented with no other symptoms of infection on her earlier ER visit, such as fever, chills, or burning upon urination. Because there was no evidence of an infection on February 9, 2009, as evidenced by the normal white blood count Mrs. Noid Inhad upon her presentation to the ER on February 11, the doctors’ failure to obtain a CBC was not causally connected to her death, which according to Dr. Irby, was not caused by sepsis or septicemia, but by liver failure after more than 13 years of serious, documented liver problems. Her liver failure, and the resulting stress on other systems, as well as her long history of heart problems, which included cardiomyopathy and congestive heart failure, led to her heart failure.[2]
Dr. Thomas Arnold, an emergency room physician and the chairman of the Department of Emergency Medicine at LSUHSC, testified as defendant’s expert in emergency medicine. According to Dr. Arnold, it was not below the standard of care for Dr. Crook to have failed to obtain a CBC from Mrs. Noid given her presentation of symptoms, her main complaint being shortness of breath. Mrs. Noid had respiratory al-kalosis, which was caused by her hyperventilation or blowing off C02. This was a result of the lessening of her Lasix dosage, which had been done by Dr. Islam, her treating cardiologist, approximately two to three weeks before her presentation at St. Francis on February 9, 2009. More likely than not, on this lowered dosage of Lasix, Mrs. Noid began to accumulate some excess | afluid, which caused her to begin to breathe a little faster and feel a sense of shortness of breath. This led to her first visit to the ER on February 9, and the appropriate treatment to remedy her excessive fluid level was to give her a little extra Lasix, which is what was done by the ER doctors. Dr. Arnold noted that Mrs. Noid’s pulse rate, which had been 114 upon presentation, had decreased to 93, which is within normal range, when she was discharged. The nurses’ notes indicate that Mrs. Noid was ambulating without difficulty and was in no acute distress at the time of her discharge.
The normal white blood cell count from the CBC obtained on February 11 made it very likely that Mrs. Noid’s white blood cell count would have been normal had a CBC been done on February 9; The CBC on February 11, 2009, showed a mild anemia which Dr. Arnold would expect with someone with a chronic disease such as Mrs. Noid. Dr. Arnold noted that the *768 bandemia, or premature cells being produced to fight infection, were 16%, which was above normal. He observed that because these bands develop very rapidly, the band elevation would not have been present on February 9. Dr. Arnold opined that Drs. Kerry and Crook did not breach the applicable standard of care in their treatment of Mrs. Noid, which included the decisions not to follow up on the CBC and to discharge her rather than admit her based upon her presentation and medical prior history.
Dr. Louie Crook testified that he was aware that he did not have Mrs. Noid’s CBC results but felt that he had enough information from other tests to determine her condition without the CBC. Because comparison x-rays were part of her computerized record, Dr. Crook was able to note that Mrs. |1sNoid had a bit of pulmonary edema and increased vascular markings, in a chronic state. Dr. Crook also looked at her blood gas, which showed a bit of respiratory alkalosis. The blood gas showed oxygen saturations in the 90s, which were good, and there was no evidence that she was in any other acute condition which would cause her to be breathing fast.
Dr. Crook had treated Mrs. Noid for congestive heart failure on several prior emergency room visits, was familiar with her medical history, and had seen her as recently as eight weeks earlier when she presented with sore throat and a fever. Dr. Crook testified .that Mrs. Noid’s complaints on February 9, 2009, were consistent with congestive heart failure, and he treated her accordingly. He noted that Mrs. Noid responded well to the Lasix and before sending her home, he discussed the discharge plan with Mrs. Noid and a family member. Mrs. Noid was instructed to follow up with Dr. Islam, her cardiologist. Dr. Crook also noted that according to her family members, Mrs. Noid had a good day and a half after her discharge the evening of February 9 before she suddenly experienced symptoms that caused her to return to the ER on February 11. Dr. Crook testified that Mrs. Noid had no symptoms of sepsis when she came into the ER on February 9. Had she been in the beginning stages of sepsis that night, following her discharge she would have been back in the hospital the next day and in an extreme condition 24 hours later.
Dr. Prem asked Dr. Crook to help him get an IV line going on Mrs. Noid on February 11. Dr. Crook put in a central line and an arterial line. The first CBC obtained on February 11 from Mrs. Noid showed a white | ublood cell count that was not elevated, although there was bandemia present. Dr. Crook -noted that Mrs. Noid’s presentation was totally different on February 11. The blood gases showed that she had an extreme metabolic acidosis coming from some source. Her presentation made sepsis a high possibility, although Dr. Crook testified that sepsis and septicemia were ruled out by the negative blood and urine cultures. According to Dr. Crook, Mrs. Noid’s white blood count was up on February 11 because her body was in stress mode, responding to an acute event, as shown by the rise in her white blood cell count just hours later.
Dr. Crook stated that Mrs. Noid had an infarction, or tissue death caused by a lack of oxygen, of the liver, which is evidenced by the dramatic rise in her liver and pancreatic enzymes. This necrotic process was dramatic and catastrophic. According to Dr. Crook, Mrs. Noid’s cause of death was liver infarction and the failure of multiple organ systems.
Dr. Merlin Wilson, who is board certified in internal medicine, allergy, immunology and rheumatology, testified that Mrs. Noid’s sarcoidosis, which had reactivated, caused her liver and lung problems, and *769 she died due to liver and heart failure. Dr. Wilson also discounted plaintiffs’ experts’ contention that Mrs. Noid had sepsis or septicemia which could have been detected by a CBC done on her first ER admission on February 9, 2009. He agreed with Drs. Irby, Arnold and Crook that her normal white blood cell count on the first CBC from her February 11, 2009, admission negated the premise that she ever had an infection. All blood and urine cultures were negative. Dr. Wilson observed that while sepsis and h «¡septicemia were listed as possible causes of death on Dr. Prem’s death summary, neither one was listed on the death certificate, which was prepared after the cultures were obtained. According to Dr. Wilson, Mrs. Noid died as a result of cardiomyopathy, sarcoidosis, congestive heart failure, and acute renal and respiratory failure.
The following is excerpted from the trial court’s written reasons for judgment:
Defense experts Dr. Thomas Arnold and Dr. Merlin Wilson and Dr. Irby all testified that the lack of a CBC on February 9 had no bearing on the ultimate outcome. A CBC was performed when Mrs. Noid returned to the emergency room two days later, on February 11, and it showed no elevated white blood cell count except for the presence of bandemia, which are immature white blood cells. They agreed that because there was no increase in white blood cells on February 11, there would have been no increase on February 9. Any bandemia that might have been present on February 9 would have matured by February 11. Blood and urine cultures were negative for any bacteria even after seven days. Blood tests on February 11 did, however, show the presence of tricyclics in her system. Tricyclics are not found in any of the medications prescribed for Mrs. Noid, and it was noted by more than one expert that tricyclics are contraindicated in patients with liver problems and could have negatively impacted her condition.
While Dr. Prem’s death summary did list sepsis and septicemia as possible causes of death, he did not have the benefit of the negative cultures when he wrote the summary on February 14. The Certificate of Death, which was signed by Dr. Prem on March 11, after the results of the cultures became available, does not designate sepsis or infection as a possible cause of death. This indicates Dr. Prem was able to rule out sepsis and septicemia when he received the results of the blood .cultures.
The Court has considered in great detail the testimony of all of the witnesses and their credibility and weighed the testimony in its entirety. In evaluating the testimony of the experts, the Court noted particularly that Dr. Simmons, and, to a lesser degree, Dr. Kottle, both Plaintiffs’ experts, were not fully knowledgeable of Mrs. Noid’s complete medical history or of her prior treatment by Dr. Crook and Dr. Irby before rendering their opinions. Setting aside the issue of the CBC, which the Court has addressed extensively herein, the facts do |1finot support the remaining allegations that the treatment of Mrs. Noid by Dr. Kerry, Dr. Crook, and/or the staff of St. Francis Medical Center fell below the applicable standard of care.
There is no evidence that the lack of a CBC on February 9, 2009, caused Mrs. Noid’s death other than speculation on the part of Plaintiffs and their experts that it would have shown something — an elevated white blood cell count — -that was not there on February 11. Based upon the totality of the evidence, it is implausible to believe a CBC would have shown infection on Monday, February 9, and then a mere two days later absent treatment for such, no evidence of infection on Wednesday, February 11. Fur *770 thermore, all blood and urine cultures subsequent to February 9 were negative for infection. There is simply no evidence to indicate that Mrs. Noid suffered from an untreated infection that caused them some loss. Rather, the weight of the evidence shows her long-term medical problems caused her unfortunate death due to liver and heart failure.
Therefore, the Court finds that Defendant has met his burden of proof and has shown by a preponderance of the evidence that Plaintiffs could not have succeeded on their original malpractice/wrongful death claims. The Court therefore finds in favor of Defendant, and Plaintiffs’ claims are dismissed at their cost.
Our review of this record in its entirety leads us to conclude that the trial court was reasonable in finding that: (1) while the failure to obtain/follow up on the CBC as ordered initially on February 9 fell below the applicable standard of care, there was no causative connection between this and Mrs. Noid’s death because the evidence showed that Mrs. Noid’s death was not due to infection but liver and heart failure; and (2) other than the CBC issue, the treatment and care of Mrs. Noid by the staff and ER doctors on February 9, 2009, did not fall below the applicable standard of care. We further find no manifest error in the trial court’s conclusion that defendant carried his burden of proving by a preponderance of the evidence that plaintiffs could not have succeeded on their original medical malpractice/wrongful death claims.

117Conclusion

For the reasons set forth above, the trial court’s judgment is AFFIRMED.

. Justice Dennis dissented in Jenkins, commending the plurality for improving the law by modifying the case within a case requirement but stating that he would go one step further and jettison the case within the case requirement. He argued that the plaintiff should be allowed to recover for the loss of his claim, which certainly had some value, regardless of whether he triumphed in a full scale hypothetical trial. Justice Dennis pointed out that an award of damages based upon a reasonable settlement value has considerable logical appeal. Contrary to plaintiffs’ counsel's argument in the instant case, the "case within a case” requirement was modified, not eradicated, by Jenkins. See Jenkins, 422 So.2d at 1114-15 (Dennis, J., dissenting).

. The trial court rejected plaintiffs' request that it disregard the testimony of Mrs. Noid’s treating physician, Dr. Scott Irby, due to inconsistencies between his testimony and that of defendant himself and Charlotte Hubbard, Mrs. Noid’s sister, regarding Dr. Irby's opinion as to whether there might be a potential malpractice claim. The trial court found that, "Considering all the factors relevant to evaluating the credibility of witnesses, the Court finds that any discrepancies in the recollections of these witnesses are not sufficiently significant so as to disregard Dr. Irby’s testimony.... Dr. Irby, as Mrs. Noid’s longtime treating physician, provided great insight into her medical history and ongoing medical problems. The Court will weigh Dr. Irby’s testimony along with that of all the other witnesses.” We have reviewed the complained of testimony and find, as did the trial court, that the discrepancies in the testimony of these witnesses are neither significant nor relevant to the essential facts of this case such as to cast doubt upon the essential truthfulness of any of these witnesses’ testimony.